STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 147-10-13 Vtec |
| --- | --- |
| **In re Killington Village Master Plan<br>Act 250 Application Appeal<br>(Act 250 Application #1R0980)** | **DECISION ON THE MERITS** |

## Table of Contents

Introduction .................................................................................................................................3

Procedural History ........................................................................................................................7

I.    Decisions on Pre-Trial Motions ............................................................................................7

    a.    Challenges to Statement of Questions ...........................................................................7

    b.    Challenges to Party Status .............................................................................................8

    c.    Propriety of Permit Conditions as to Traffic Studies and Corridor Studies. ..................10

II.    Post-Trial Settlement with Pinnacle..................................................................................11

Findings of Fact ...........................................................................................................................12

I.    Parties Appearing in this Appeal.......................................................................................13

II.    The Master Plan Application and its Components—An Overview .......................................15

II.    Phase I—Specific Developments.......................................................................................16

    a.    Village Core ..................................................................................................................16

        1.    Road Realignment of Killington and East Mountain Roads and Additional Parking Areas.........16

        2.    Main Village Core Development (New Housing Units and Commercial Space, Skier Services Areas and Base Lodges, and Additional Parking Areas and Village Green). ......................................18

    b.    Ramshead Brook Subdivision.......................................................................................21

    c.    New Potable Water Supply Systems.............................................................................24

III.    Anticipated Impacts of Phase I Development.....................................................................25

    a.    Stormwater and Stream Impacts. .................................................................................25

    b.    Traffic and Highway Impacts.........................................................................................31

        1.    Background and General Overview of Improvements. ............................................31

        2.    Traffic Improvements; Shuttle Services. ..................................................................33

      3.     Killington Road Realignment; Intersection with Road H.............................................34

      4.     Traffic Estimates; Needed Conditions.....................................................................36

   c.   Municipal Impacts...................................................................................................42

   d.   Aesthetic Impacts...................................................................................................44

IV.     Twenty-Five-Lot Subdivision and its Impacts...............................................................47

V.     Future Master Plan Developments and Their Possible Impacts .........................................50

VI.     Town and Regional Plans .........................................................................................51

Conclusions of Law...........................................................................................................51

I.     Party Status Determinations....................................................................................53

II.     Master Plan Review ...............................................................................................56

III.     Twenty-Five-Lot Subdivision ....................................................................................60

   a.   Criterion 1(B) (Impacts from Sewage Disposal and Stormwater)...................................62

   b.   Criterion 1(D) (Floodways).......................................................................................63

   c.   Criterion 1(E) (Stream Impacts) ...............................................................................63

   d.   Criterion 1(G) (Wetlands)........................................................................................64

   e.   Criteria 2 and 3 (Adequacy of Water Supplies and Impacts upon Adjacent Supplies) ..................64

   f.   Criterion 8(A) (Wildlife and Endangered Species) .......................................................65

   g.   Criterion 9(B) (Primary Agricultural Soils)..................................................................65

   h.   Criteria 9(D) and (E) (Earth Resources) .....................................................................65

   i.   Criterion 10 (Conformance with Local and Regional Plans) ...........................................66

IV.     Review of Phase I Developments—The Village Core and Ramshead Brook Subdivision ...............67

   a.   Scope of Review.....................................................................................................67

   b.   Criterion 1(E): Streams............................................................................................67

   c.   Criterion 5: Traffic .................................................................................................69

   d.   Criterion 7: Burden on Municipal Services .................................................................74

   e.   Criterion 8: Aesthetics.............................................................................................76

   f.   Criterion 9(K): Burden on Public Investment...............................................................78

   g.   Criterion 10: Conformance with Town and Regional Plans ............................................80

Conclusion......................................................................................................................84

**Introduction**

SP Land Company, LLC ("SPLC") owns 1,302± acres near what is commonly referred to as the Killington Ski Resort ("Resort") in Killington, Vermont. SPLC has proposed a master plan for redevelopment of the commercial and residential lands around the Resort. The master plan envisions eight "development zones" totaling 2,300 dwelling units and 200,000 square feet of commercial space. SPLC seeks an Act 250 land use permit for Phase I of that master plan, which entails development of two of the eight development zones proposed in the master plan (the Village Core zone and the Ramshead Brook Subdivision zone), and construction and renovation of well fields to service the Phase I developments ("the Killington Village Water System Project"). SPLC also seeks an Act 250 land use permit to subdivide and/or adjust the boundary lines of its Killington land holdings, which will result in twenty-five distinct parcels ("the Twenty-Five-Lot Subdivision"). The Twenty-Five-Lot Subdivision will facilitate the development proposed in its master plan.

The present plan for redevelopment has a long history. In the 1980s and 1990s, ASC owned and operated Killington Ski Resort. It also owned surrounding developable lands. Subsequent to the bankruptcy of ASC, SPLC acquired a portion of the Resort properties formerly owned by American Skiing Company ("ASC"), specifically the existing or to be developed commercial lands, including the base lodges, retail spaces, and the lands that have been the subject of plans for future developments of second homes and other residential and commercial properties. Most of the remaining ASC properties are part of the actual Killington Resort facilities, including the lands upon which the ski trails, lifts, and related improvements are operated; those lands were acquired by a separate entity: Killington/Pico Ski Resort Partners, LLC ("KPSRP"). KPSRP is the entity that now owns and operates the Resort.

ASC had hoped and did propose development of a "village core" at the base of the Resort. ASC and other developers received partial findings of fact on their master plan application in 2000 ("the #1R0835 master plan findings"), see Re: Killington Ltd., et al., No. 1R0835-EB, Findings of Fact, Conclusions of Law and Order (Partial) (Vt. Envtl. Bd. Jul. 20, 2000), but those plans proved impossible due to financial pressures. The positive partial findings issued in the 2000 master plan approval expired in 2004.

3

After SPLC acquired the commercial and residential lands, it sought to continue ASC's efforts to revitalize and develop a village core area for the commercial and residential operations associated with the Resort, albeit with changes and revisions to the master plan ASC proposed. SPLC first began its development efforts nearly twelve years ago when it sought an "administrative amendment"[1] to the #1R0835 master plan findings for a ten-lot subdivision in and around the Resort ("the #1R0835-1 proceedings"). In 2008, SPLC sought another administrative amendment for a fifteen-lot subdivision, and the District Coordinator granted the amendment ("the #1R0835-3 proceedings"). SPLC represents that the ten-lot subdivision proposed in the #1R0835-1 proceedings and the fifteen-lot subdivision proposed in the #1R0835-3 proceedings are the same or similar subdivisions that are part of the Twenty-Five-Lot Subdivision application now before this Court.

The District Coordinator granted an administrative amendment in the #1R0835-3 proceedings, and that decision was appealed to this Court and became the subject of Docket No. 257-11-08 Vtec. Those appeal proceedings revealed that while the proposed master plan that had first been reviewed by the former Environmental Board in connection with its July 20, 2000 decision (the #1R0835 master plan findings), no actual Act 250 permit had been applied for or issued. This Court nonetheless held that, because the subdivision was unlikely to cause any Act 250 impacts, it satisfied the requirements for an administrative amendment. In re SPLC Land Co. Act 250 Permit Amendment (LUP #1R0835-3), No. 257-11-08, slip op. at 9 (Vt. Envtl. Ct. Dec. 1. 2009). The appellant there—Mountainside Properties, Inc.—then sought further review before the Vermont Supreme Court.

The Vermont Supreme Court reversed on appeal, holding that the administrative amendment procedure can only be used to amend full permits, and cannot be used to amend partial master plan findings. In re SP Land Co. Act 250 Land Use Permit Amendment, 2011 VT 104, ¶ 25, 190 Vt. 418. The Supreme Court therefore held that the fifteen-lot subdivision

---

[1] A district coordinator is authorized to issue an administrative amendment to a previously issued Act 250 permit "when an amendment is necessary for record-keeping purposes or to provide authorization for minor revisions to permitted projects raising no likelihood of impacts under the criteria of the Act." See Act 250 Rules, Rule 34(D)(1).

proposed in the #1R0835-3 proceedings required full review under all Act 250 criteria, and could not be approved through the administrative amendment process. Id. at ¶ 26.

We recognize that this procedural history dates back more than sixteen years, but we briefly review it here for two reasons: first, the prior applications and administrative amendments provide context, even though hindsight regards them as ill-advised and of no legal precedent. Second, we note that in some instances at and after trial, SPLC has referred to the fifteen-lot portion of its proposed subdivision application as a "re-approval of the subdivision of the fifteen lots that were initially approved in Administrative Amendment #1R0835-3." See, e.g., SPLC Proposed Findings of Fact and Conclusions of Law at 10, filed Feb. 2, 2015. Given that the Supreme Court specifically reversed this Court's affirmation of the District Coordinator's administrative amendment in the #1R0835-3 proceedings, we conclude that it is improper to introduce the proposed subdivision application as a "re-approval." And, though the ten-lot subdivision approval in #1R0835-1 was final and binding, and therefore not affected by the Supreme Court's decision, SPLC represents that the approval has expired. We therefore intend to review the fifteen-lot subdivision and the ten-lot subdivision for their conformance with all applicable Act 250 Criteria that have been preserved for our review in this appeal.

SPLC first submitted the Act 250 master plan and land use permit applications that are the subject of this appeal on February 28, 2012. KPSRP, which owns and operates the Resort itself and which is not an applicant or party in this appeal, simultaneously filed a separate application for Act 250 permit approval of its plans to (1) relocate the Resort's day skier parking lots to adjacent KPSRP lands, (2) undertake related roadway and other improvements, and (3) construct and operate new stormwater treatment systems. In response to these simultaneous filings, the District Commission coordinated its review of these two separate applications. As noted in the Conclusions of Law section below, these two separate de novo appeals were separately tried before this Court.

The District #1 Environmental Commission ("District Commission") began its review of SPLC's master plan application with a pre-hearing conference on April 9, 2012 and commenced its merits hearing on May 31, 2012; that merits hearing was recessed on June 5, 2012, after which the Commission requested additional information and began its deliberations. The Commission thereafter issued its Findings of Fact, Conclusions of Law and Permit on October 3,

5

2013, in which it reviewed SPLC's master plan and approved its permit applications, subject to certain conditions.

The pending appeal concerning SPLC's Act 250 master plan application was started by SPLC filing a timely appeal of the District Commission's approval, specifically challenging several of the Commission's party status determinations, as well as the Commission's decision to include certain conditions in the issued permit relating to future traffic and corridor studies, fire suppression sprinkler systems in all residential dwellings, future permit amendments to ensure compliance with design guidelines, and the Commission's retention of jurisdiction under Act 250 Criteria 5, 8 and 10. See Appellants' Statement of Questions to be Determined on Appeal at 1–4, filed November 20, 2013 ("SPLC's Statement of Questions").

Stephen Durkee ("Mr. Durkee") and entities owned or controlled by Mr. Durkee—Mountainside Properties, Inc.; Mountainside Development, Inc.; Fireside Properties, LLC; and Killington Village Properties, Inc. (collectively, "the Durkee Entities")—filed a timely cross-appeal.

SPLC is represented in these proceedings by Christopher D. Roy, Esq.; the Durkee Entities are represented by Nathan H. Stearns, Esq. and C. Daniel Hershenson, Esq.

The following other individuals or entities have appeared as interested persons before the Court in this appeal:

- Pinnacle Condominium Association ("Pinnacle"), an association of owners of individual units in a nearby condominium development; it is represented by Jon S. Readnour, Esq.

- Highridge Condominium Owners Association ("Highridge") is an association of owners of individual units in another nearby condominium development; it is represented by Carl H. Lisman, Esq.

- Mountain Green Condominium Association and Edgemont Home Owners Association are two other associations of owners of individual units in two separate, nearby condominium developments; they are collectively represented by Melvin B. Neisner, Jr., Esq.

- Rutland County Regional Planning Commission, Two Rivers-Ottauquechee Regional Commission, and Southern Windsor County Regional Planning Commission (collectively, "the Regional Commissions") are three separate Central Vermont regional planning commissions. They are collectively represented by Robert E. Woolmington, Esq.

6

- The Vermont Natural Resources Board, which is represented by Gregory J. Boulbol, Esq.

- The Vermont Agency of Natural Resources, which is represented by Elizabeth Lord, Esq.

- Shelburne Volunteer Fire Department, d/b/a the Killington Volunteer Fire and Rescue ("Killington Fire & Rescue"), which is represented by Melvin B. Neisner, Jr., Esq.

### Procedural History

### I.  Decisions on Pre-Trial Motions

After each appellant filed their respective Statement of Questions and after the parties had exhausted their initial efforts at a global settlement, the Court considered several pre-trial motions, culminating in a 29-page decision issued on August 6, 2014.  See In re Killington Village Master Plan Act 250 App. Appeal, No. 147-10-13 Vtec, slip op. at 5–7 (Vt. Super. Ct. Envtl. Div. Aug. 6, 2014) (Durkin, J.) ("Pre-Trial Motions Decision").  The Pre-Trial Motions Decision addressed the following issues concerning party status and the jurisdictional scope of this appeal.

a.  *Challenges to Statement of Questions*

The Court first addressed the NRB's motion to dismiss or clarify SPLC's Statement of Questions 8, 9, and 13.  Question 8 directly challenged a condition in the District Commission's permit approval requiring SPLC to contribute its proportional share to traffic mitigation measures, arguing that the condition did not have "supporting evidence in the record." Question 9 directly challenged a permit condition requiring sprinkler systems in all buildings. Question 13 asked the Court to remand the appeal to the District Commission "to clarify and correct various matters . . . ."

While the Court agreed that the challenged questions were somewhat unartfully drafted, the Court concluded that these questions raised justiciable issues and declined to dismiss them.  See Pre-Trial Motions Decision at 5–7.  While Questions 8 and 9 appeared to ask the Court to review the validity of the District Commission's decision, the Court concluded it would interpret the questions to ask whether the Court could impose similar conditions in its de novo review.  The Court also directed that SPLC file a clarification of its Question 13.  Id. at 7;

7

SPLC made such a filing on August 20, 2014. No party filed a procedural challenge to SPLC's clarification of its Question 13.

      b.    *Challenges to Party Status*

The Court next took up SPLC's challenges to the party status of several other entities appearing in this appeal. These challenges were the subject of Questions 1 through 6 in SPLC's Statement of Questions. Several parties asked the Court to revisit these party status determinations after trial, and we do so in Conclusions of Law Part I, below.

SPLC's Questions 2, 5, and 6 challenged the party status of Charles Demarest (an owner of a business at the corner of Killington Road and Vermont Route 4), the Okemo Limited Liability Company (operator of the Okemo Ski Resort), and the Town of Bridgewater. Each of these three entities had initially appeared in the District Commission proceedings, but none of them had entered an appearance in the appeal filed with this Court. Because these three entities were not parties, they could not be dismissed. The Court therefore dismissed SPLC's Questions 2, 5, and 6 as non-justiciable.

The District Commission granted party status to all Durkee Entities—Mr. Durkee; Mountainside Properties, Inc.; Mountainside Development, Inc.; Fireside Properties, LLC; and Killington Village Properties, Inc.—under Criteria 1(B), 1(D), 1(E), 4, 5, 8, 9(K), and 10. SPLC challenged the Durkee Entities' party status, arguing that none of the Durkee Entities had party status under Criteria 1(B), 4, 5, or 9(K); that only Mr. Durkee had party status under Criteria 1(D) and 1(E), and that only Mountainside Properties had party status under Criterion 8. The Durkee Entities conceded that no party but Mr. Durkee had party status under 1(B), 1(D), 1(E), and 4, but argued that all of the Durkee Entities had party status under 5, 8, 9(K), and 10. See Pre-Trial Motions Decision at 10–11.

The Court concluded that Mr. Durkee had party status under Criterion 1(B) because the property owned in his personal name was near a stream that might be impacted by improper waste disposal. The Court denied party status to Mr. Durkee under Criterion 4 because he had failed to demonstrate a reasonable possibility that soil erosion would injure his particularized interest.

8

With regard to Criterion 5, only Mr. Durkee alleged that he had a particularized interest in traffic conditions near the Killington Resort. The Court therefore granted party status to Mr. Durkee under Criterion 5, but denied it to all other Durkee Entities.

With regard to Criterion 8, Mr. Durkee alleged that all Durkee Entities other than Killington Village Properties had views of the proposed development. The Court therefore granted party status under Criterion 8 to all Durkee Entities except Killington Village Properties. Because Mr. Durkee did not articulate a particularized interest in public roads for any of the Durkee Entities (other than traffic congestion concerns already expressed under Criterion 5), the Court denied party status to all Durkee Entities under Criterion 9(K). The Court also determined that Mr. Durkee did not have standing to raise arguments under Criterion 9(K) regarding his access to the Calvin Coolidge State Forest because he had failed to demonstrate that the master plan would materially jeopardize his use or enjoyment of the state forest. The Court's conclusions on the Durkee Entities' party status are summarized in the following table:

| Party Status of the Durkee Parties | | |
|---|---|---|
| Appellant | Property | Criteria |
| Stephen Durkee | 2134 Killington Road & 2023 Killington Road | 1(B), 1(D), 1(E), 5, 8, 10 |
| Mountainside Properties, Inc. | East Mountain Road & U.S. Route 4 | 8, 10 |
| Mountainside Development, Inc. | Mountainside Drive | 8, 10 |
| Fireside Properties, LLC | 1128 Killington Road | 8, 10 |
| Killington Village Properties, Inc. | 923 Killington Road | 10 |

We next addressed SPLC's challenges to the party status of two of the three Regional Commissions that had entered appearances in this appeal: the Two Rivers Ottauquechee Regional Commission ("TRORC") and the Southern Windsor County Regional Planning Commission ("SWCRPC").

We concluded that the TRORC was entitled to retain the party status it requested under Criterion 5 and 9(K)[2] because parts of the proposed development bordered the Town of

---

[2] We actually concluded that TRORC was entitled to statutory party status under all criteria pursuant to 10 V.S.A. § 8502(5)(D), but understand that TRORC only wished to address legal issues under Criteria 5 and 9(K).

Bridgewater,[3] one of TRORC's member towns, and the TRORC was therefore a statutory party under 10 V.S.A. § 8502(5)(D). While we concluded that SWCRPC was not entitled to party status, on the Court's own motion, we provided SWCRPC with the right to participate as a friend of the court pursuant to 10 V.S.A. § 6085(c)(5). Id. at 22.

c. *Propriety of Permit Conditions as to Traffic Studies and Corridor Studies.*

SPLC's Questions 7 raised a more thorny legal issue. The Question asks "[w]hether findings of fact and conclusions of law can properly . . . [be made] for subsequent phases under Act 250 criteria 5 (Traffic), 9(A) (Impact of Growth), and 9(K) (Public Investments)" when an applicant has not requested such findings and legal conclusions in a master plan proceeding.

To address this legal issue, we revisited the purposes and goals of Act 250 master plan review as established by the NRB, the entity charged with administering review of state land use permit applications. The NRB points us to a procedural guide for reviewing master plan applications entitled "Master Permit Policy and Procedure for Partial Findings of Fact (2000)" ("Master Plan Policy").[4] The stated objective of the Master Plan Policy "is to provide guidance and greater predictability to the applicant and all parties in the review of complex development projects." Master Plan Policy at 1, available at http://www.nrb.state.vt.us/publications/policies /masterpmtpolicy.pdf. While a land use permit for any given phase of a master plan requires full review under all ten Act 250 criteria, the Master Plan Policy authorizes the reviewing tribunal to issue "partial" findings of fact (i.e., positive findings on fewer than all of the Act 250 criteria) for future phases of a master plan. The Act 250 Rules (2009)[5] do not expressly

---

[3] We realized at trial that our party status determination for TRORC was premised upon a mistake of fact: that the Town of Bridgewater, a TRORC-member town, had a common boundary with a portion of the master plan project site. While this proved not to be true, the trial revealed that another TRORC member town—the Town of Plymouth—does share a boundary with a portion of the master plan project site. Therefore, our TRORC party status determination remains undisturbed by this mistake of fact revealed at trial. See Conclusions of Law Part I, infra.

[4] The Master Plan Policy was originally authored by the former Vermont Environmental Board, the state administrative entity that preceded the NRB. The NRB has continued to reference and rely upon the Master Permit Policy.

[5] The NRB most recently amended the Act 250 Rules in 2015. The revised Rule 21(D) now explicitly mentions master planning and permitting, and appears to codify many of the principles and policies expressed in the Master Plan Policy. The 2009 version of the Act 250 rules apply to this appeal, however.

announce the procedures for master plan review, presumably since the NRB has established such procedures in its Master Plan Policy.

Based on the stated objective of the Master Plan Policy, we concluded that we would issue final positive findings under specific criteria for future phases of the master plan if SPLC had met its burden under those criteria. Pre-Trial Motion Decision at 25–26. We also concluded that we would issue "guidance" under the remaining criteria (whether SPLC specifically requested such guidance or not) based on evidence introduced at trial. Id. Finally, we concluded that we could attach conditions regarding future phases of the master plan to the final positive findings we issued in our master plan review. Id.

For these reasons, our trial included evidence concerning all Act 250 criteria applicable to the Phase I permit and master plan, based upon the facts presented at trial. In our Conclusions of Law section below, we analyze the weight and credibility of that evidence, render the appropriate findings, and announce what conclusions of law those findings warrant. Our Conclusions of Law section, below, also addresses the specific legal issue posed in SPLC's Question 7: whether our review is limited to the specific Act 250 Criteria for which SPLC has requested positive findings, even when the evidence presented causes us to be concerned about other impacts that may be caused by the master plan as presented at trial.

II.     **Post-Trial Settlement with Pinnacle**

In a related but separate appeal before this court, KPSRP, which owns and operates the Killington Resort facilities (ski trails, lifts, etc.) proposes to relocate its parking lots and skier services centers ("the Parking Project"). See In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.). This relocation will facilitate the developments SPLC proposes in Phase I.

In the Parking Project Appeal, KPSRP and Pinnacle Condominium Association (which is also a party to this appeal) reached a settlement after trial that resulted in Pinnacle withdrawing its objections to both the master plan and Parking Project Act 250 applications, subject to some revisions to the proposed "Road H" site plans being admitted into evidence, post-trial, and accepted by the Court in the merits decisions on both appeals, as well as a separate appeal of the permit issued in response to KPSRP's Parking Project municipal permit

11

application.[6] KPSRP formally moved for admission of the revised Road H plans on November 4, 2015. The Court initially afforded all other parties thirty days in which to state their objections to the Court admitting the revised site plans for Road H. See In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec, slip op. at 12 (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.). Upon receiving responses from the Durkee Entities and the NRB, as well as a reply memorandum from KPSRP, the Court determined that no party objected to the Court accepting the revised site plans for Road H without a further evidentiary hearing and therefore granted KPSRP's motion. Copies of the revised plans were attached to KPSRP's original November 4, 2015 motion as Exhibits A, B, and C and have been included in the evidence admitted in the Master Plan proceedings as well.[7]

SPLC also moved for the withdrawal of Pinnacle's opposition to the master plan and Phase I application; Pinnacle consented to SPLC's motion, based upon its settlement agreement and premised upon the Court's acceptance of the revised Road H site plans. When no other party filed an objection, the Court granted SPLC's motion and noted Pinnacle's withdrawal of its objection to the pending master plan and Phase I application. See In re Killington Resort Master Plan Act 250 Application, No. 147-10-13 Vtec, slip op. at 1–2 (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.).

### Findings of Fact[8]

The Court conducted a site visit of the areas involved in SPLC's master plan, the Durkee Entities' properties, and other relevant areas just prior to the trial on the Parking Project

---

[6] That appeal has been assigned Docket No. 155-11-14 Vtec. The only parties appearing in that appeal are SPLC and Pinnacle. Pursuant to a settlement by the parties in that municipal appeal, the Court granted a motion for affirmation of the site plan approval issued by the Town of Killington Planning Commission for the proposed Parking Project, but stayed the entry of judgment until this Court issued its merits decisions in the Parking Project and master plan appeals. See In re Killington Resort Parking Project Site Plan Approval, No. 155-11-14 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.).

[7] While admission of these revised plans was granted post-trial, they were not assigned specific exhibit numbers in either appeal. Rather, we have referred to the revised Road H plans by the exhibit letters assigned to them as attachments to SPLC's post-trial motion.

[8] Our review here is limited to the legal issues preserved for our review by the Statements of Questions presented by SPLC and the Durkee Entities, subject to the party status and other limitations announced by this Court in its Pre-Trial Motions Decision, discussed above at in the section entitled Procedural History Part I.

application; that site visit also provided context for the evidence presented in the master plan de novo appeal. Based upon the credible evidence presented at trial, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision. Any findings below that address or are impacted by site plans in the Parking Project appeal are based on the revised site plans admitted post-trial as a result of the settlement between KPSRP and Pinnacle.

## I.       Parties Appearing in this Appeal

1.       Cross-Appellant Stephen Durkee owns properties in his individual name located at 2134 Killington Road and 2023 Killington Road in the Town of Killington. The property at 2134 Killington Road includes a single residence, and the property at 2023 Killington Road includes a market/office building and associated parking. The 2134 Killington Road property is located approximately 1.3 miles below (north of) of the Village Core area on Killington Road, and the 2023 Killington Road property is located approximately 1.4 miles north of the Village Core area on Killington Road. The 2023 Killington Road property adjoins Roaring Brook.

2.       Mr. Durkee also owns a controlling interest in Cross-Appellants Mountainside Properties, Inc.; Mountainside Development, Inc.; Fireside Properties, LLC; and Killington Village Properties, Inc.

3.       Mountainside Properties, Inc. ("MPI") owns properties located on East Mountain Road and on U.S. Route 4 in the Town of Killington. Both MPI properties are undeveloped. The U.S. Route 4 property is approximately 1.75 miles from the Village Core area as the crow flies and roughly 4.5 miles from the intersection of U.S. Route 4 and Killington Road. No part of the Resort or the proposed improvements is visible from the Route 4 property.

4.       Mountainside Development, Inc. ("MDI") owns property on Mountainside Drive in the Town of Killington. The MDI property is an undeveloped single residential lot within a subdivision.

5.       Fireside Properties, Inc. ("Fireside") owns property at 1128 Killington Road in the Town of Killington, approximately 2.3 miles from the Village Core area. The Fireside property includes a hunting lodge and associated cabins.

6.      Killington Village Properties, Inc. ("KVP") owns commercial property at 923 Killington Road in the Town of Killington. The KVP property is approximately 2.5 miles from the Village Core area. No part of the Resort or the proposed improvements is visible from this property.

7.      Mr. Durkee resides at 337 Old Elbow Road in the Town of Mendon, Vermont. He regularly travels Killington Road in the area of the Village Core in order to access the properties owned by the other Durkee Entities.

8.      The Southern Windsor County Regional Planning Commission ("SWCRPC") is a compact of ten municipalities in east-central Vermont and is a political subdivision of state government organized under 24 V.S.A. § 4341. Interstate 91 runs through several member towns. The Town of Killington is not a member of SWCRPC. SWCRPC has been involved in assessing land use and traffic impacts within its region related to developments at the Killington and Okemo ski resorts.

9.      The Two Rivers-Ottauquechee Regional Commission ("TRORC") is a compact of thirty municipalities in east-central Vermont and is a political subdivision of state government organized under 24 V.S.A. § 4341. Some member towns host I-89 and its intersection with U.S. Route 4. The Town of Killington is not a member of TRORC. However, the Towns of Plymouth and Bridgewater are members of TRORC. TRORC has been involved in assessing land use impacts in Plymouth and other towns within its region related to development at the Killington Resort.

10.     The District Commission granted TRORC standing as a statutory party on the basis that some of the proposed master plan developments bordered the Town of Bridgewater, and the Court granted TRORC party status on that basis in its Pre-Trial Motions Decision. The evidence at trial revealed that none of the proposed developments border the Town of Bridgewater. However, the Cherry Knoll lot, one of the lots proposed in the Twenty-Five-Lot Subdivision, borders the Town of Plymouth, which is also a member of TRORC.

11.     The four homeowner associations who have appeared in this appeal (Pinnacle, Highridge, Mountain Green, and Edgemont) consist of owners of one or more condominium units in the four separate condominium developments, all of which are located near the existing Killington main base area.

12. The Sherburne Volunteer Fire Dept., Inc. d/b/a Killington Fire & Rescue ("Killington Fire & Rescue") is a private independent entity that contracts with the Town for the delivery of fire and emergency medical first response services in and around the Town of Killington. Killington Fire & Rescue is not a subdivision of the Town and does not enjoy statutory party status in Act 250 proceedings.

**II.     The Master Plan Application and its Components—An Overview**

13. On February 28, 2012, SPLC filed its Act 250 application for (1) a permit for the subdivision of some of its land into a total of twenty-five lots; (2) a permit for the construction and use of Phase I of the Killington Village Master Plan; and (3) review of its overall master plan.

14. The master plan contemplates multiple phases of development involving approximately 2,300 residential units, a 77,000-square-foot replacement skier services building, and other commercial space to be developed over the next twenty to thirty years. The commercial space comprises approximately 200,000 square feet, including the skier services building, and will be used for hotel and staff facilities, conference rooms, ballrooms, retail, and other amenities.

15. The overall master plan is broken into eight "development zones":

| | |
|---|---|
| Snowdon Glades | The Vale |
| Yodeler's Run | Snowshed Woods |
| Killington Club | The Links |
| Village Core | Ramshead Brook Subdivision |

16. Two of the identified development zones—the Village Core and the Ramshead Brook Subdivision—make up the development identified as Phase I, the phase for which SPLC is now seeking an Act 250 permit. Phase I also includes the Killington Village Water System Project, which entails the development and renovation of well fields to supply potable water for the Village Core and Ramshead Brook Subdivision development zones.

17. SPLC's subdivision plans include a total of twenty-five lots. Fifteen of the lots are identified on a colored map admitted at trial as SPLC Exhibit 4, page 1; the individual boundary lines for each lot, with metes and bounds descriptions, are on a set of certified survey maps that were admitted at trial as SPLC Exhibit 37. The remaining ten lots are to be created by a separate subdivision of lands that are identified on a colored map admitted at trial as SPLC

Exhibit 4, page 2; the individual boundary lines for each lot, with metes and bounds descriptions, are on a set of certified survey maps that were admitted at trial as SPLC Exhibit 36.

18.     These twenty-five lots are to be part of several developments that will occur through the future phases of the master plan, including Phase I.

19.     With regard to the remaining portions of the master plan (i.e., the six development zones other than the Village Core and Ramshead Brook Subdivision), it is uncertain what specific phases will be developed and when, since the future development of the individual lots will be subject to future demand and economic realities.

20.     SPLC may pursue development of future phases itself, or may sell off one or more of the proposed lots or development zones for future development by others.

**II.     Phase I—Specific Developments**

21.     Phase I of the Master Plan entails construction of two of the eight development zones proposed in the master plan: the Village Core development zone and the Ramshead Brook Subdivision development zone.  It also entails construction of two potable water systems.

22.     SPLC Exhibit 1 provides a site plan overview of all components of the proposed Phase I developments.  The exterior boundaries of the proposed developments are outlined by a red dotted line.

        a.     *Village Core*

23.     The Village Core development involves 193 housing units; 31,622 square feet of commercial space; 77,000 square feet of replacement skier service areas within two new base lodge buildings; relocation of a portion of Killington and East Mountain Roads; additional parking areas; and a new Village Green.

24.     Much of the Village Core development takes place near the existing Resort and its supporting facilities.  The Resort is owned and operated by KPSRP, which is not a party to this appeal.

                1.     Road Realignment of Killington and East Mountain Roads and Additional
                       Parking Areas

25.     Two existing parking lots—the Snowshed and Ramshead lots—currently serve as day skier parking areas for the Resort.  The proposed Village Core developments will begin with the

16

deconstruction of two existing Snowshed and Ramshead parking lots, which are roughly defined gravel parking areas off of East Mountain Road.  These existing parking areas will be used in part for the construction of new commercial buildings, new parking areas, and the relocations of Killington and East Mountain Roads.

26.     In a separate application (the subject of the Killington Parking Project appeal, see In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec (Vt. Super. Ct. Envtl. Div. Mar. 4, 2016) (Durkin, J.)), KPSRP proposes to reconstruct those day skier parking areas on improved lands owned by KPSRP just below (north of) the Village Core.  KPSRP will encourage day skiers to use shuttle buses that will transport day skiers from the new Parking Lots C through J to the Village Core area—specifically, to a drop-off area just below the new base lodges.  We make reference to the parking project solely for context purposes, particularly in regards to where the day skier parking lots are planned to be relocated.

27.     The existing Snowshed Base Lodge and Ramshead Base Lodge will also be demolished, so as to make way for the Village Core developments.

28.     The portion of Killington Road that is encompassed by the Phase I developments is a private roadway, owned and maintained by SPLC with maintenance contributions from other developments and developers.  Killington Road will be realigned, as depicted on SPLC Exhibit 5 (the engineered site plans); it will cause incoming traffic to flow into a traffic rotary, which will disperse traffic that wishes to either continue on Killington Road (leading to the K-1 lodge and base area) or to a reconfigured East Mountain Road (towards the existing Killington Grand Resort Hotel) or to the proposed new roads A, B, D, E, and F, which lead to and around the new developments in the Village Core.

29.     Several new parking lots are proposed for the Village Core area.  These parking areas will be used by the occupants of the new residential units or other visitors to the Village Core. There will be two new permanent lots—Parking Lots A and B—and four lots to be used temporarily until development is proposed for their areas in subsequent phases of the Master Plan.  These four temporary lots are depicted on SPLC Exhibits 1 and 5 as Parking Lots T1, T2, T3, and T4.  The four temporary lots will provide parking for a total of 350 vehicles.  Each of these lots will be paved with clear pavement markings of the parking spaces.

30. As part of the redevelopment of these parking lots, the parking area for the adjacent Mountain Green Condominiums will be reconfigured, particularly in the area where it will adjoin the proposed Parking Lot B.

31. The parking lots and internal roadways will be illuminated with light fixtures that will be strategically located at key vehicular and pedestrian conflict areas. The light fixtures will be mounted about sixteen feet from finished grade, using boxed metal halide fixtures that will shield views of the illumination source from all off-site locations. The levels of illumination will be the minimum levels needed to provide safe passage and security.

32. The new roadways, realignment of Killington and East Mountain Roads, the relocated day skier parking lots and new parking lots will provide a better means for traffic to flow to and through the Resort main base area. The relocation of the day skier parking lots and the Resort-operated shuttle services will reduce the amount of traffic congestion at and near the main base areas.

33. No identified streams flow on or through the area designated for the various Phase I developments. In fact, the realignment of Killington Road was designed, in part, to act as a separation between the proposed Village Core developments and the most closely located water course: the Roaring Brook. With one minor exception, the embankments along the re-aligned Killington Road will be located more than fifty feet from Roaring Brook. The Vermont Agency of Natural Resources ("ANR") generally recommends that all new developments maintain a fifty-foot buffer from streams.

> 2. Main Village Core Development (New Housing Units and Commercial Space, Skier Services Areas and Base Lodges, and Additional Parking Areas and Village Green).

34. The main Village Core development will consist of six major structures, internal pedestrian plazas and sidewalks, green spaces and other lawn areas, all as depicted on SPLC Exhibit 5 at 1 and SPLC Exhibit 10 at 11.

35. Two of the proposed structures will provide commercial space on their base levels, as well as skier services areas or base lodges for those skiers using the Snowshed and Ramshead

sections of the Killington Ski Resort.  These two buildings are depicted as Buildings 1X-VC and 1X-RH on SPLC Exhibits 4 and 5.

36.     These two buildings will be connected by an enclosed walkway that will be constructed on a bridge above Killington Road.  This bridge will also provide for a skiable area above the roadway, so that skiers and pedestrians may travel above Killington Road without having to enter the roadway and take off their skis.  This development will be a vast improvement over the existing facilities, which require individuals to dismount from their skis and cross the existing Killington Road when they wish to go between the existing Snowshed and Ramshead base lodges.

37.     The four other buildings proposed as part of the Village Core development of Phase I are depicted on the applicable site plans as Buildings 1A/B, 1C, 1D/E, and 1F/G.[9]  These buildings will host various commercial spaces, including retail shops, restaurants, and condominiums and other residential developments in the upper floors of the buildings.  SPLC Exhibits 7 and 8 provide convincing representations of how the proposed buildings will appear to Village Core visitors.

38.     The proposed buildings will also host underground parking for a total of 217 vehicles. Also, two additional surface parking lots will be provided near the skier services buildings (Buildings 1X-VC and 1X-RH), which will provide parking spaces for a total of thirty-three vehicles.

39.     A "Village Green" area will be constructed between the grouping of Buildings 1A/B, 1D/E, 1F and 1G.  The Village Green will be circled by Roads A, B, D, and F and will connect to several pedestrian walkways between these buildings that then connect to walkways that lead to the skier services buildings (Buildings 1X-VC and Building 1X-RH) and to the Killington Grand Resort Hotel; that Hotel will be aesthetically complemented by the nearby Village Core developments.

---

[9]  Some of the site plans, including SPLC Exhibits 1 and 5 at 1, show two separate buildings labeled 1F and 1G.  However, these two buildings are linked and in some site plans are labeled with a single reference to Building 1F/G.  See, e.g., SPLC Exhibit 5, Drawing 2.02.

19

40. The proposed buildings will consist of three to four stories, with an average height of sixty to sixty-eight feet. This height will be comparable to several other nearby developments, including the Mountain Green Condominiums (which are about seventy-one feet in height) and the Killington Grand Summit Hotel (which is sixty feet in height).

41. SPLC's architectural expert provided credible and convincing testimony about the design efforts for the proposed buildings and the Village Core area. The designs were determined after completing a thorough review of historic Vermont villages, such as Manchester Center, Manchester Village, Stowe, and Woodstock, and similar already-developed resort villages, such as the Jackson Gore development at Okemo Resort, the Hotel Jay at Jay Peak Resort, the Clay Brook development at Sugarbush Resort, and the Spruce Peak development at Stowe Resort.

42. To integrate the positive aspects of these developments into the design of the proposed Village Core, SPLC established the beneficial objectives of making the designs fit with a traditional Vermont landscape and other regional traditions; emphasizing the necessary durability in designs due to high visitor (including skier) volumes and changes in temperature and precipitation; and, most important, varying the design of exterior surfaces to provide a softening to the mass and size of the structures.

43. The exterior of the structures will consist of a variety of soft colors often found in typical Vermont village and resort areas. The exterior materials will consist of traditional horizontal clapboard and other wooden vertical materials, with standing seam metal and colored asphalt shingled roofs. See SPLC Exhibit 7.

44. This design and construction will present a pleasing appearance for the Village Core structures that will allow visitors to recognize the area as an established resort village. The design and construction of the new Village Core buildings will complement the other nearby properties, including the Mountain Green Condominiums, the Mountain Inn, the Cascades Lodge, the Killington Golf Course and Country Club, and the Killington Grand Summit Hotel.

45. This type of development of the Resort main base area has been proposed and sought for the last thirty years of the Resort's existence by the various owners of the Resort, the Town, and regional planning officials. SPLC's current plans complement and improve upon the existing and proposed developments near the Resort Village Core.

b.    *Ramshead Brook Subdivision*

46.    The Ramshead Brook Subdivision development zone is proposed for a parcel of land[10] on the west side of Killington Road, just below (north of) the Village Core area.

47.    The land proposed to host this subdivision combines four lots proposed in the Twenty-Five-Lot-Subdivision detailed below in Part IV of our Findings of Fact: Parcels BA1, BA2, 5B4, and 5BN, which together consist of 44.69± acres.  Thus, the average lot size in the Ramshead Brook Subdivision is about 1.4± acres.

48.    Access to this subdivision will be over an access road that will spur off of Killington Road to the west, just above (south of) the Killington Road intersection with the proposed Road H. There will also be access to and from the Ramshead Brook Subdivision by way of a ski trail that will travel from the base of the Ramshead Quad ski lift to the subdivision.

49.    Sight distances at the intersection of the subdivision access roadway and Killington Road are sufficient for drivers of turning vehicles to enter and exit the intersection, and for drivers of vehicles travelling through the intersection to safely see the entering and exiting vehicles in sufficient time to safely avoid collisions.

50.    The Ramshead Brook Subdivision will be a residential subdivision of thirty-two residential lots.  There are no permits sought for individual lot development in this application, but SPLC has proposed that either all 32 lots could be developed to host individual residential dwelling units, or up to 23 lots could host duplex buildings that would host two dwelling units. The decision on whether to develop the lots with single-family or duplex homes would be up to the future individual developer and subject to the needed state and municipal approvals.

51.    The internal roadways will provide road frontage to all lots in the subdivision.  The roadways, individual lots, grass swales, and nearby water courses are depicted on SPLC Exhibit 22.

52.    The layout of the lots will afford usable green spaces for the lot owners that will also contribute to the beneficial flow and treatment of stormwater.

---

[10]

21

53. The Ramshead Brook Subdivision will incorporate new stormwater treatment systems, such as swales, grassed areas to filter sheet flow, and berms to protect riparian buffers. The stormwater that is initially treated on the Ramshead Brook Subdivision site will then flow into the new stormwater treatment system that this Court approved in connection with the KPSRP Parking Project. See In re Killington Resort Parking Project Act 250 Appeal, No. 173-12-13 Vtec, slip op. at 18–20 (Vt. Super. Ct. Envtl. Div. Mar. 4, 2016) (Durkin, J.).

54. While this area is currently undeveloped, the proposed stormwater treatment systems will mark an improvement for this land and the surrounding area, since stormwater that currently flows across the lands earmarked for the Ramshead Brook Subdivision and from nearby developments, including the main base areas and the existing Ramshead and Snowshed parking lots, receive little to no treatment or beneficial flow regulation.

55. Ramshead Brook flows over lands that are outside of the boundaries of the proposed Ramshead Brook Subdivision. Ramshead Brook flows into another stream: the Roaring Brook. Both streams and their delta are protected by a vegetated buffer strip of at least fifty feet, except in the single area where the access roadway will cross over Roaring Brook. That single stream crossing will be accomplished via a bridge that will be supported by embankments outside of the Brook streambed. Details of that Brook crossing are accurately provided in the site plans.

56. Just above (south of) the subdivision access roadway, the Ramshead Brook flows into the Roaring Brook. Roaring Brook flows from south to north, through lands that will not be part of the subdivision, but the Ramshead Brook will be closer to the eastern external boundary of the proposed subdivision than Roaring Brook. Ramshead Brook flows from the west, above (south of) the proposed subdivision, and then flows to the east around the land proposed for the Ramshead Brook Subdivision.

57. The proposed subdivided lots are laid out so as to avoid encroachment into the Ramshead Brook or a fifty-foot buffer protecting the Brook. The only proposed encroachment into the Ramshead Brook buffer will occur above (south of) the proposed subdivision at a point where a bridge will be constructed, outside of the Brook, that will allow skiers to ski along a trail that travels from the base of the Ramshead Quad ski lift and into the Ramshead Brook

22

Subdivision. Construction of this bridge, like the bridge over the Roaring Brook to serve the access roadway, has been designed to protect the Brook and its buffer during construction and use.

58.     On all other nearby SPLC lands through which Ramshead Brook travels, the Brook will be protected by a buffer well in excess of fifty feet, except in one location, due to the realignment of Killington Road.

59.     Potable water supplies for the individual lots will be provided by the existing public water supply systems that will be supplemented by the proposed new wells, detailed below. The main supply line will enter the Ramshead Brook Subdivision near the bridge for the access roadway over the Roaring Brook; this water supply line will be fed by the main water supply line that already travels underground and near the existing and re-aligned Killington Road. The water supply line that will serve the subdivision will be buried six feet below the ground surface; where it meets the Roaring Brook, it will be encased in a concrete vessel and buried more than six feet below the base of the stream bed. SPLC's engineers prepared plans to cause minimal disturbance to the Brook during this construction and installation.

60.     Sewer disposal services will be provided to the individual subdivision lots by the existing public wastewater treatment systems that already serve the Resort and related developments. That system has adequate capacity to serve the individual Ramshead Brook Subdivision lots.

61.     Fire hydrants will be installed along the access roadway and the internal subdivision roads to provide assistance to those responding to fires within the subdivision.

62.     Killington Fire & Rescue, through the testimony of one of its volunteer members (a former fire chief), advocated at trial for a condition to be attached to any SPLC permit approval that would require all residential dwellings in the Phase I development, including those constructed within the Ramshead Brook Subdivision, to have fire-suppression sprinkler systems, fed by tie-ins to the pressurized water supply systems. The rationale offered for this suggestion is that response vehicles may be delayed in responding to fire calls when traffic is heavy on Killington Road, and having sprinkler systems in the residential buildings would slow down fires, protecting both the residences that have sprinkler systems and surrounding properties that might be in the path of a spreading fire.

63.    No evidence was presented that suggested that any applicable federal, state, or local regulations require the installation of sprinkler systems in all individual residential dwellings, nor was there any evidence presented that such a condition had been imposed on any other development, either at the Killington Resort or elsewhere in Vermont.

64.    Homes within the Ramshead Brook Subdivision will be constructed by a future developer or individual homeowners.  The design of these buildings will be held to certain design guidelines that encourage designs that build upon the region's natural beauty, rich history, and active lifestyle.  The design guidelines were admitted at trial as SPLC Exhibit 9.

65.    Each lot in the Ramshead Brook Subdivision will have its own parking area.  No shared parking or parking lot is planned for the subdivision.

c.    *New Potable Water Supply Systems*

66.    The existing developments in and near the Killington Resort are served by an existing and permitted public water supply system.  The operator of this public water supply system constructs and maintains the water supply lines that serve the individual units within each development.  The main water supply line travels along Killington Road, with supply line spurs that serve each development.

67.    All developments within the proposed Phase I will be served by this public water supply system.

68.    The proposed potable water supply system expansions include the expansion of the existing collection of potable water supply wells, identified as the Snowdon Well Field Project ("SWF Project"), and the construction of a new series of potable water supply wells, to be known as the Valley Well Field Project ("VWF Project").

69.    The SWF Project is located just above (south of) the Phase I project areas, as identified on SPLC Exhibit 19: the Site Location Map.  The SWF Project will be located adjacent to the existing Snowdon wells.

70.    The well site for the VWF Project is located near the Ottauquechee River, in an area where it flows along U.S. Route 4.  The VWF Project will not encroach into the Ottauquechee River or its protection buffer.

71.     Both the expanded SWF Project and the VWF Project will tie into the existing water supply lines that travel along Killington Road and serve the existing and proposed Killington Resort developments.  Both Projects, when connected to the existing water supply lines, will provide more than sufficient potable water to the developments proposed in Phase I.

III.     **Anticipated Impacts of Phase I Development**

72.     The developments proposed in SPLC's master plan, including the Phase I developments, are located in an area already heavily developed as part of the Killington Ski Resort, with associated independent developments along much of the Killington Road access way.  As one travels up the Killington Road from U.S. Route 4, the clear impression delivered by the existing developments is that one is travelling towards a major resort development.  In fact, the Killington Resort is regarded as the largest ski resort east of the Mississippi River.

73.     The Killington Resort has been owned and controlled by several different entities over the last forty or more years.  During some ownership periods, the Resort has experienced major expansions and proposals for further expansions.

74.     The expansions proposed by SPLC in its current Act 250 application, particularly the Phase I developments, are most accurately described as redevelopment of already-developed areas.  Some of the Phase I developments, particularly the Ramshead Brook Subdivision, will occur upon currently undeveloped and wooded areas, but those areas are located within walking distance of the existing and planned Ramshead and Snowshed base areas.  For the most part, the Phase I developments will complement and expand upon the existing Resort.

75.     In regards to the Phase I developments, the credible evidence shows the following impacts to the surrounding lands, areas, and communities:

    *a.     Stormwater and Stream Impacts.*

76.     The existing Killington developments have already had significant impacts upon area streams and water bodies, such that portions of area streams have become so degraded as to be identified as impaired waters by ANR.  These stream impairments have been caused by erosion of stream banks and the introduction of silt and pollutants into streams carried by

25

untreated or minimally treated stormwater flowing from nearby developments during regular and significant storm events.

77. There was no evidence presented during trial that SPLC or other owners of nearby developments have caused violations of the applicable stormwater statutes, regulations, and rules. Rather, many of the existing developments were permitted and constructed decades earlier, some before the current stormwater regulations were in effect. In addition, evolutions in technology and the understanding of stormwater flows and impacts have allowed stormwater to be more effectively treated, thereby reducing the opportunity of stormwater to transmit silt and pollutants into nearby streams and water bodies.

78. An example of the reality just stated occurs on the very lands that SPLC now proposes for subdivision and development. Much of the SPLC lands, especially the lands that will host the Phase I developments, are the site of existing developments that were permitted and constructed decades ago, during a time when stormwater, erosion, and pollution regulations were not as evolved as they are today.

79. In the existing developments, particularly the Snowden and Ramshead parking lots, stormwater and the silt and pollutants that flow with it receive minimal treatment and flow regulation before reaching area streams and wetlands. These realities contributed to the degradation of the nearby streams, including the Ramshead and Roaring Brooks and the other area streams that branch off of those Brooks.

80. SPLC worked with ANR officials and various experts to develop a Water Quality Remediation Plan ("WQRP") for the areas it proposed for development. The WQRP proactively sets out to improve the condition of area streams and waterways that were impacted by dated or ineffective stormwater runoff management practices associated with previously developed areas. The WQRP (a copy which was admitted at trial as SPLC Exhibit 15) provides extensive explanations of how stormwater capture and treatment plans will not just maintain, but improve the quality of the waters receiving treated stormwater, both from the existing developments and those proposed by SPLC and KPSRP. The proposed improvements to the stormwater treatment systems, once constructed in accordance with the WQRP, will cause a

marked improvement to the quality of the receiving waters and an improvement to the protection of the stream channels through which those waters flow.

81. SPLC presented a draft of its WQRP to ANR officials, and those officials suggested further revisions. SPLC then completed further revisions to its WQRP to incorporate these ANR recommendations. A copy of that revised WQRP was admitted at trial as SPLC Exhibit 16. ANR provided credible testimony as to how and why the final draft of the WQRP, once implemented, will cause stormwater that flows through the to-be-developed areas will be properly treated and stored in retention ponds to reduce the unregulated and minimally treated flow of stormwater into area streams.

82. The details of SPLC's stormwater treatment and retention plans, including the details of the finalized WQRP, were incorporated into two permits issued by ANR: the first ANR permit governs the use and operation of the revised stormwater treatment systems during the construction of the Phase I Village Master Plan developments, the Ramshead Brook Subdivision, the VWF and SWF Projects, and the Resort Parking Projects and improvements proposed by KPSRP. ANR issued Construction Stormwater Discharge Permit #6774-INDC ("Construction Permit") on May 23, 2013; a copy of that permit was admitted at trial as SPLC Exhibit 11.

83. The second ANR stormwater permit governs the operation, maintenance, and use of the revised stormwater treatment systems after construction and during the use of those developments. This permit is the Operational Stormwater Discharge Permit #6774-INDS ("Operational Permit"), which ANR also issued on May 23, 2013; a copy of that permit was admitted at trial as SPLC Exhibit 12.

84. The Construction Permit shows that SPLC's developments, including its upgraded stormwater treatment plans, comply with the Vermont Water Pollution Control statutes (10 V.S.A. ch. 47), the Vermont Water Pollution Control Rules, and the applicable provisions of the federal Clean Water Act and corresponding regulations.

85. The Operational Permit provides the details of how stormwater will be treated. The treatment scenarios, while complex, incorporate three general manners of discharge: first, stormwater that flows from some of the Village Core buildings and some of its parking areas, roads, and existing Resort improvements will drain via sheet flow, drainage disconnections,

swales, catch basins, and culverts to a preliminary treatment system consisting of underground sand filters and then into the existing Snowshed Pond near the Killington Grand Hotel, where the collected and preliminarily treated stormwater will be further treated by allowing silt and other materials to settle and be further filtered from the stormwater. The Pond will also allow for storage and retention of stormwater, so that flows from storms can be regulated, thereby decreasing the peak flows during significant storms.

86.     The second general manner of stormwater discharge and treatment will govern the flow of stormwater from the remaining Village Core buildings, all remaining Resort parking lots, roads, open areas, and the Ramshead Brook Subdivision by directing those discharges via sheet flow, grass channels, swales, catch basins, and culverts to the Stormwater Wet Pond 1 forebay and main pond on KPSRP property for treatment and control prior to discharge via a controlled outlet, eventually directing the treated stormwater to the Roaring Brook.

87.     The third general manner of discharge will collect stormwater from the various remaining areas of proposed development and direct it through grass swales, wet ponds, and two dry detention ponds. The treated stormwater will then be discharged through vegetated areas, wooded areas, or sheet flow, ultimately to either the Roaring Brook, an unnamed tributary of the Roaring Brook called Falls Brook, or the Ottauquechee River.

88.     No person or entity filed a timely appeal from the Construction or Operational Permits. These Permits therefore became final thirty days after issuance.

89.     The proposed improvements to the stormwater treatment systems will significantly reduce the silt and pollutants from stormwater that flows from all areas encompassed by the proposed Village Core, the Ramshead Brook Subdivision, the lands encompassed by the six remaining development zones, and the proposed Parking Project areas. Thus, less silt and fewer pollutants will be discharged to those waters than are currently discharged. For this reason, we conclude that the proposed development will both assure against a degradation of the quality of the receiving waters and will improve the quality of those receiving waters.

90.     The improved stormwater treatment system will also significantly increase the system's capacity to store and regulate the flow of stormwater into the receiving streams during the regular storms that occur every year, significant storms (such as those that only occur on

average once every ten years), and even during extreme storms (such as those that only occur once every 100 years).

91.     The proposed developments will increase the amount of impervious surfaces (rooftops, parking areas, etc.) in and near the Village Core.  While this increase in impervious surfaces will initially increase the volume of stormwater, the improved stormwater treatment systems will restrict the amount of stormwater that will ultimately leave those developed areas.  As noted above, all that stormwater will receive adequate treatment and flow regulation prior to being discharged from the developed areas.

92.     The volume of stormwater that will ultimately leave the developed areas will be reduced by the infiltration of stormwater through grassed areas and other components of the treatment systems, allowing the stormwater to infiltrate into the groundwater in the developed areas.  The ponds within the treatment systems also will provide for storage and regulated discharge of treated stormwater, such that the flow of stormwater during rain storms will not be as voluminous as it is now, prior to this proposed development.

93.     When stormwater is not regulated, or only minimally regulated, the volume of stormwater flowing into streams, particularly during significant storms, can sometimes rip into stream banks and scour the stream bed and banks.  Developments that significantly increase the area of impervious surface within a watershed or sub-watershed, without improvements to stormwater treatment systems, can also significantly increase the volume of stormwater that flows into nearby streams.  When allowed to occur, this stream scouring degrades the stream banks and introduces more silt and other particulate matter into the stream waters.

94.     The Durkee Entities expressed concerns that the developments SPLC proposes, particularly the Phase I developments, will cause significant increases in the volume of stormwater that flows into nearby streams, particularly during significant storms, so much so that the proposed developments will cause degradation of the stream banks through scouring, thereby changing the character of the streams.  The credible facts presented at trial did not support their concern.  In fact, the credible facts showed that the proposed developments, by virtue the improved stormwater systems, will regulate and reduce the flow of stormwater,

29

including during significant and even extreme storms, so as to reduce the opportunities for stream scouring.

95. This reduction or elimination of possible stream bank scouring post-development will help restore nearby streams to their natural condition.

96. There was no credible evidence presented that the proposed developments, particularly in regards to their impact upon area streams, will endanger the health, safety, or welfare of the general public or adjoining landowners.

97. The Durkee Entities expressed a separate concern about the developments, namely that because the relocation of Killington Road will include a reduction in its elevation, and because portions of the Road and other nearby developments (including Buildings 1X-VC and 1X-RH, where Killington Road will pass beneath the enclosed hallway that joins the two buildings) will have basement elevations lower than Roaring Brook (the nearest stream), the Roaring Brook will become a "losing stream," that is, a stream that loses water through infiltration into the groundwater from the stream bed and banks. The credible facts did not support the Durkee Entities' assertions.

98. There was no evidence presented that any portion of the Roaring Brook is currently a losing stream, even with the existence of Resort developments near its banks.

99. SPLC credibly showed that, while the finished development elevations in some places would be lower than the nearby stream elevations, there will be sufficient earthen barriers and distance between the two to make the loss of water from the stream due to its slightly higher elevation most unlikely. In fact, an ANR employee expert with significant expertise and experience with stream morphology advised that she had observed several similar scenarios where buildings and roads were constructed at elevations lower than nearby streams and had not witnessed the loss of stream water that the Durkee Entities suggested. We found her testimony, as well as the testimony of SPLC's expert, to be the most credible on this issue.

*b.*     *Traffic and Highway Impacts.*

1.     Background and General Overview of Improvements.

100.    The existing Killington Resort causes considerable traffic to flow on area highways. Given the appeal of the Resort to both Vermonters and those living out-of-state, traffic flowing to and from the Resort uses area highways, as well as state and interstate highways as far away as eastern and southern Vermont and beyond.

101.    While the Killington Resort is by far the most significant development on Killington Road, it is by no means the only development that contributes measurable traffic to the area roadways.  In fact, many businesses and commercial entities operate at facilities along the more than three-and-a-half miles of Killington Road that precede the approach to the Killington Resort.

102.    Estimating what additional traffic a proposed development may generate is both science and art.  The science of traffic estimation includes both the actual counting of vehicles during a given hour and determining what amount of traffic is generated by similar types of developments that already exist.  The art of traffic generation is determining what other developments and their settings are so similar to a proposed development as to provide an accurate foundation for estimating a development's future traffic generation.  Traffic experts, including those employed by the parties in this appeal, use established traffic estimating manuals, including those sanctioned by the national highway traffic safety organizations.

103.    All parties provided some plausible factual foundations for estimating the traffic that is likely to be generated by the Village Core and Ramshead Brook Subdivision developments.  We found the traffic estimates presented by the SPLC experts more credible, but, as explained below, we have remaining concerns about the accuracy of even SPLC's traffic predictions. Those uncertainties have led us to consider measures that could be put in place to mitigate the possible adverse traffic impacts, should SPLC's traffic estimates be exceeded by the actual traffic generated by the proposed projects.

104.    There are certain realities about the proposed development, the operation of the Killington Resort, and the current traffic on area roadways that impact upon our traffic findings and legal analysis, including the following.

31

105. First, the proposed development does not include an expansion of the existing skiing facilities. We therefore conclude that, since on-mountain skiing facilities will not be expanded, the Resort's capacity to entice skiers, particularly those who travel to and from the Resort on the same day ("day skiers") will not materially increase.

106. In addition, annual visits to Killington and other Vermont ski resorts have declined over the last decade. Credible evidence at trial, including references to actual traffic counts, showed that the traffic that passes through the U.S. Route 4 intersection with Killington Road has actually decreased for several years within the last decade, even during the normally heavy-traffic winter months. The credible representations showed that the current traffic volumes are similar to traffic volumes recorded in 1991.

107. The principal premise of the proposed developments is to increase the number of overnight guests at or near the Village Core area, with an increase in condominium units, hotel rooms, homes and duplexes. Thus, while the number of visitors to the Village Core area is likely to materially increase, not many of those guests are likely to arrive and leave on the same day. In fact, many of the Village Core guests are likely to remain at or near the Village Core area for stays extending over several days, a week, or more. Many will walk or take the proposed shuttles rather than drive between their condominium or home and the ski lifts, shops or restaurants in the Village Core area; some may drive down Killington Road to visit other shops and restaurants, but not travel so far as U.S. Route 4. Some other guests will venture down Killington Road to U.S. Route 4 and beyond.

108. SPLC presented a credible general plan and purpose for its proposed Phase I developments, one that was essentially uncontradicted by the other parties: that these developments will establish a sense of place—one that does not currently exist at the main base area—and that the Village Core developments in particular, especially the Village Green, Main Street thoroughfare and the Ski Plaza, will be a central hub of activity for Resort visitors. These plans for the Village Core developments, if accomplished, will encourage guests to stay one or more nights at the Resort facilities, rather than travelling area roads to and from the Resort on the same day.

109.    Collectively, when these visitors walk or drive to the shops and restaurants in the Village Core or on Killington Road, they are taking "trips" in the parlance of traffic estimators, but because these trips are taken by walkers or by individuals driving a short distance along Killington Road, such trips do not have the same traffic impacts as those vehicle trips that continue down Killington Road to U.S. Route 4 and other adjoining highways.  SPLC's traffic expert made a convincing distinction between these two general types of travelers, the first being the "on-mountain" traveler and the second being the "off-mountain" traveler.

2.    Traffic Improvements; Shuttle Services.

110.    SPLC's planned Phase I improvements also include measures that will help alleviate the traffic congestion at what is now known as the main base area.  Presently, all visitors wishing to access the skiing facilities drive into the main base area via Killington Road.  The two parking areas near the Snowshed main base lodge provide the majority of parking for day skiers; a separate parking area adjacent to the Ramshead lodge provides additional day skier parking. Under the Phase I plan, day skiers will leave Killington Road before they reach the main base area and will park at the new day skier lots to be constructed on the adjacent KPSRP lands (Parking Lots C through J; See SPLC Exhibit 5, Drawings C-2.03 and C-2.04).  These revisions to the day skier parking plans will reduce traffic congestion at the main base area

111.    Those using the new day skier parking lots may either walk to the new Village Core area (Lot C, the closest lot, will be about two tenths of a mile away; sidewalks will be available for walkers' use) or take one of the shuttle buses that will travel in a circular route to and from the Village Core.  During particularly busy periods, sixteen busses will be used to shuttle visitors between the day skier parking lots and the Village Core area.  Each bus will be able, on average, to complete two full shuttle routes during each hour of operation on the busiest winter weekends.

112.    During the Resort's busiest periods, the shuttle busses will also use trailers to accommodate additional visitors.  With the attached trailers, a shuttle bus could accommodate up to sixty individuals who wish go to and from the Village Core area.

113.    The realigned Killington Road will lead drivers into a traffic rotary that will allow for a more efficient and safe distribution of traffic; the rotary will allow drivers to continue on

Killington Road to the K-1 base area, to travel on various new internal roads in the Village Core area, or to travel easterly to East Mountain Road, where the Killington Grand Hotel and other developments are located.

114. These improvements will allow a more safe and efficient flow of traffic than the arrangements existing in and around the current main base area. The existing parking lots are ill-defined and lead to a central main base area, where all traffic collects.

### 3. Killington Road Realignment; Intersection with Road H.

115. SPLC proposes to realign Killington Road as it approaches the planned Village Core and Ramshead Brook Subdivision improvements. The road realignment will begin across from the proposed Lot G, where an access way into that parking lot will be cut into Killington Road; the realigned Killington Road will continue through the proposed traffic rotary in the Village Core to a point above (south of) the proposed Buildings 1X-VC and 1X-RH, where the existing Killington Road continues onto the K-1 base lodge. The realigned Killington Road will pass between Buildings 1X-VC and 1X-RH, under a walkway that will connect the two buildings.

116. Access to the Ramshead Brook Subdivision will be from the realigned Killington Road. At this point along the realigned Killington Road, the posted speed limit will be 25 MPH. This intersection will be constructed so as to afford more than sufficient intersection sight distances for all drivers travelling through the intersection on either roadway; the sight distances in all directions will allow for sufficient views of approaching traffic, no matter which way the driver is turning or travelling.

117. At some portion below (north of) the main base area, the speed limit along the existing Killington Road increases to 35 MPH. Because of this increased speed limit, a greater intersection sight distance is required than if the 25 MPH speed limit were maintained throughout the realigned Killington Road.

118. KPSRP proposes to build a new internal road, to be known as Road H, that will provide access to its new day skier parking lots (Lots C through J), as well as a through access to the existing Old Mill Road. These road and parking lot improvements are components of the separate KPSRP application for the Parking Project Act 250 application, which was the subject of the separate appeal to this Court in Docket No. 173-12-13 Vtec. Since the proposed Road H will

34

intersect with Killington Road in an area that will be realigned, thereby introducing new turning vehicles onto the realigned Killington Road, we address in this master plan appeal the impact upon traffic of this new intersection.

119.    Safe sight distances are a factor of the speed limit and the nearby terrain.  It was undisputed by all parties at trial that the applicable national traffic safety standards recommend that a driver attempting to turn into an intersection, in a vehicle that is stopped 15 feet from the travelled lane of the road that the driver wishes to enter, must have a clear line of sight of oncoming traffic on the road that she wishes to enter of at least 390 feet if the speed limit for the road she wishes to enter is 35 MPH.  If the speed limit of that road is 25 MPH, the driver will be able to safely enter the road if she has a clear line of sight of traffic in either direction of at least 280 feet.  These recommended intersection sight distances have been adopted by the Vermont Agency of Transportation ("VTrans") in its Standards for Residential and Commercial Drives ("B-71 Standards"), a copy of which was admitted at trial as Durkee Exhibit 34.

120.    A driver entering Killington Road from the Ramshead Brook Subdivision, where the speed limit is 25 MPH, will have clear sight distances in excess of the recommended minimums.

121.    A driver entering Killington Road from Road H, where the speed limit is currently 35 MPH, will not have clear sight distances satisfying the recommended minimums.

122.    At its intersection with Killington Road, Road H will have three travel lanes: one lane for traffic turning from Killington Road onto Road H and two travel lanes for traffic travelling on Road H to Killington Road.  The southern (left hand) outlet lane on Road H will be for traffic turning left and intending to travel to the Village Core, and the northern (right hand) lane will be for traffic turning right onto Killington Road, towards U.S. Route 4 and Vermont Route 100.

123.    Similarly, Killington Road will have a dedicated left-hand lane for southbound traffic making a left-hand turn onto Road H.  A second, right-hand lane on Killington Road will allow through traffic to continue to travel up to the Village Core area.  In the roadway area from the Village Core towards the intersection with Road H, Killington Road will have two northbound lanes travelling away from the Village Core.  This will allow through traffic to safely continue past vehicles making a right-hand turn onto Road H.

124. Road H will be paved, and the travel lanes will be marked, including arrows painted on the pavement to mark the direction of intended travel at the intersection with Killington Road.

125. Travelers on Road H heading west, towards Killington Road, will be afforded sufficient sight distances to the north for the Road H driver to turn onto Killington Road in a safe manner, so as to avoid oncoming traffic coming up Killington Road. This sight distance will be in excess of 390 feet.

126. That same Road H driver may only have as little as 255 feet of sight distance to the south.

127. There is a wooded embankment above (south of) the Road H/Killington Road intersection, on the interior (eastern) corner. Thus, tree and brush clearing on this embankment will afford a greater sight distance to the south for the Road H driver. This clearing will afford that driver a view from the intersection in excess of 280 feet (the intersection sight distance recommended for 25 MPH zones), but we are uncertain that clearing could afford views to the south in excess of 390 feet (the intersection sight distance recommended for 35 MPH zones).

128. SPLC would also need to clear snow from this southeastern corner of the Road H/Killington Road intersection during the winter months to maintain adequate sight distances.

129. As noted above, if the speed limit were to remain at 25 MPH throughout the reconfigured Killington Road, drivers on Road H would only need 280 feet of unobstructed views of the vehicles approaching from the Village Core area, since the Killington Road vehicles would be approaching at a slower pace.

130. Traffic warning signs that prepare drivers from the Village Core area for a continued speed limit of 25 MPH would provide more assurance that drivers will adhere to a 25 MPH speed limit.

4.      Traffic Estimates; Needed Conditions.

131. SPLC provided credible traffic generation estimates for the proposed Phase I developments. Its calculations resulted in a comprehensive Traffic Impact Study ("TIS") of Phase I, dated December 23, 2011. See SPLC Exhibit 24. After SPLC sought and received input

from VTrans, its traffic experts revised the TIS.  See SPLC Exhibits 25 (summary of TIS changes), 26 (TIS addendum), and 32 (replacement figures and tables for TIS).

132.   During trial, there were extended disputes about the most accurate estimate of visitors staying "on-mountain."  The Durkee Entities provided some credible criticisms of the traffic estimates offered by SPLC, with criticism specifically directed at the proportion of Killington Resort visitors likely to stay on-mountain.  For the following reasons, we find that the SPLC estimates were more credible.

133.   First, while the developments proposed by SPLC are significant, they are most likely secondary in bringing visitors to the Killington Resort.  The ski and other off-season mountain facilities are what have and will attract visitors to the Village Core.  Stated differently, if the proposed Village Core developments were proposed in an area that didn't have skiing facilities, we doubt that as many visitors would be attracted to and remain at the Village Core developments.  In the latter scenario, we expect that fewer visitors would remain on-mountain for multiple days or longer.

134.   Secondly, the Killington Resort is unique when compared to many other Vermont ski resorts, in that Killington has many more shops, restaurants, and other entertainment opportunities along its access road.  Vermont resorts such as Okemo Mountain, Mt. Snow, Stratton Mountain, Stowe Resort, Bromley Mountain, Jay Peak Resort, Burke Mountain, and Ascutney Mountain (now defunct) have few independent or resort-owned facilities outside of their respective base areas.

135.   SPLC's Phase I plans will provide more shops, restaurants, and entertainment facilities within its Village Core than those available at other Vermont ski resorts.  Thus, Killington will perhaps offer the most varied incentives for visitors to stay on-mountain than any other Vermont ski resort.

136.   Because of the complexity of the pre-existing developments in and near the Killington Resort, as well as the Resort's more than fifty-year history, traffic impacts from the Resort have been assessed for as long as Act 250 has been in place.  Beginning thirty or more years ago, as the Resort and associated development were expanded, state and municipal development permits were conditioned upon the Resort owners completing studies of the development's

impact upon Town and regional highways. See Durkee Exhibit 35: A Trip Generation Study of Land Uses in the Killington Ski Resort Area (1988).

137.    The traffic experts employed by the prior owners of the Killington Resort to complete the 1988 Resort traffic study are the same experts employed by SPLC to conduct the traffic analysis for the proposed Phase I developments. Those experts provided the most credible assessment of the current and future traffic contributed by the Phase I developments.

138.    Traffic experts often focus upon two types of assessments of traffic and traffic increases: the "peak hour," which represents the highest volume of traffic expected to be caused by a new development, and the "design hour," which represents the thirtieth highest hour of traffic. The design hour of traffic is often used in determining what types of highway or intersection improvements may be needed in response to proposed developments.

139.    Traffic planners tend not to rely upon the peak hour of estimated traffic for a proposed development when considering needed traffic improvements or mitigation measures because of the other adverse impacts that may flow from designing and developing highways to easily accommodate the peak hour traffic, recognizing that the remaining 8,759 hours of traffic in a given year will not require such extensive highway development.

140.    The highest levels of traffic experienced on Killington Road are during the busiest winter weekends; the highest level of traffic occurs on Saturday afternoons between 4:00 to 5:00 PM during the winter months of December and January. The 30th busiest hour of traffic in any given year historically occurs during this same ski season hour.

141.    Neither VTrans nor the Regional Planning Commissions concluded that the volume of traffic added by the proposed Phase I developments warranted traffic mitigation measures. However, several parties asserted that the Court should condition any permit approval upon requiring SPLC to complete certain traffic studies, at regular intervals, to determine the actual traffic impacts of the proposed developments.

142.    For perspective, we note that the most credible estimates of existing (i.e., pre-development) traffic upon Killington Road set the volume of traffic, averaged over an annual basis, as 4,400 vehicles per day, with the peak hour (a winter Saturday between 4:00–5:00 PM) at slightly more than 1,000 vehicle trips.

143. Estimating the traffic to be added by the proposed development requires delineation. This is not the type of development that encourages business customers to visit their establishments for a few hours or even a single day. Further, it is reasonable to conclude that some of the visitors to these new developments will be people who have previously visited the area and will have otherwise stayed at other lodging establishments at or near the Killington Resort. As noted above, when considering the impact of the proposed development, we also conclude that it is important to differentiate between those Resort visitors that stay "on-mountain" and those that are likely to travel "off-mountain" in their vehicles on any given day.

144. Both SPLC and the Durkee Entities advocated for estimating traffic generation by applying a multiplier to the dwelling units to be built, with the former recommending a multiplier of .45 one-way vehicle trips/day per new residential unit and the latter recommending .65 trips/day/unit. While we found the SPLC calculations more credible, due to the nature of the existing and proposed developments, we also found this methodology simplistic. Thankfully, we had further expert calculations and estimates to rely upon for our consideration.

145. One further delineation we found credible is that, given the mixed uses that will constitute the new Phase I developments, we expect that some visitors to the Village Core will choose not to take any trips during their visit to the Resort, but rather to stay in the Village Core area to enjoy the skiing and the restaurants and shops for a period extending over a weekend or longer.

146. With these delineations in mind, we conclude that the Phase I developments, once fully operational and open to the public, are likely to cause nearly 280 new one-way trips during the peak hour of traffic (4:00–5:00 PM on Saturdays in December and January). Of that total, about 100 of the peak hour trips that are generated by these developments will actually be contained within the Village Core area. Forty of the peak hour trips are likely attributable to skiers or hotel guests who would have otherwise already visited the Resort; another 40 peak hour trips will likely remain "on-mountain." Thus, the total number of trips taken "off-mountain" and thereby impacting upon traffic on Killington Road and beyond are likely to total about 100 trips during the peak hour of traffic.

147. Given the similarities between the existing Resort development and that proposed for Phase I, the peak hour of traffic is likely to occur at the same or similar time.

148. Given this level of added traffic, particularly when considering the lower levels of added traffic for the design hour (i.e., the 30th busiest hour of traffic), we conclude that the Phase I developments will not create unreasonable congestion or unsafe conditions on the area highways.

149. Estimating added traffic caused by such a multi-dimensional development gives us some concern, however, both as to the accuracy of these estimates and what impacts may be caused by the actual traffic generated, particularly if these estimates, while credible, prove to be less than accurate. These concerns about the Phase I developments' traffic impacts warrant requiring SPLC to monitor the traffic prior to and after the construction of these developments, so that changes in permit conditions may be considered, particularly if the actual traffic generated is heavier than estimated.

150. Any traffic report must include a count of traffic before the proposed development is opened and occupied, so as to provide a base measurement. Additional traffic measurements that are taken one year after occupancy of the new development, as well as five thereafter, will provide a reasonable basis for determining whether the traffic estimates considered in this application have proved accurate. Requiring SPLC to generate these traffic reports and release them to the District Commission will help verify those accuracies. Granting the District Commission continuing jurisdiction, so that it can reopen proceedings and require SPLC or its successors to implement necessary additional traffic mitigation measures, will ensure that no adverse traffic impacts will result, should these estimates prove inaccurate.

151. The following additional traffic mitigation steps will help minimize the traffic impacts of the proposed Phase I developments:

1. Maintain a 25 MPH speed limit along Killington Road, from above the Village Core area to past the access point to Parking Lot G, thereby slowing traffic at the Road H/Killington Road intersection, and thereby reducing the needed intersection sight distances for that intersection.

2. Place warning signs on Killington Road, above and below the intersection with the proposed Road H, to announce the lowered speed limit.

3. Clear trees and brush from the southeastern corner at the intersection of Road H and Killington Road, so as to allow a vehicle driver on Road H at that intersection to have an unobstructed view of traffic coming down Killington Road of at least 280 feet. For the same reason, SPLC must also clear snow from the intersection corner during the winter months to maintain the same minimum sight distance.

4. Continue the practice of stationing a law enforcement officer at the intersection of Killington Road and U.S. Route 4 between 4:00 and 5:00 PM on Saturdays in December and January to assist in the flow of traffic. SPLC must also arrange to have a law enforcement officer at this intersection during any special Resort activities where heavy traffic is anticipated.

5. Conduct further traffic studies at regular intervals to assure the accuracy of traffic volume estimates from the proposed Phase I developments.

6. Assist with the funding of a regional traffic corridor study, to be conducted by the Regional Commissions, so that long range and far away traffic impacts caused by these developments may be considered.

152. There was uncontested evidence presented of vehicle crashes occurring on Killington Road, about a mile and a half below the main base area, at its intersection with Dean Hill Road. Another area that experienced vehicle crashes was at the intersection of U.S. Route 4 and Vermont Route 100, at the end of Killington Road. The Phase I developments are not likely to cause a material increase in the frequency of traffic accidents at these or other locations.

153. Another means by which traffic impacts are assessed is to determine the delays experienced at highway intersections; these delays are graded using a "level of service" ("LOS") measure that ranges from an "LOS A" for intersections with minimal to no traffic delays to an "LOS F" for extreme and unacceptable delays. An acceptable LOS rating for an intersection is regarded as one rated no worse than an "LOS C." Where an intersection experiences a lower LOS rating, a proposed development should not be allowed to make the intersection worse.

154. Under current conditions, the intersection between Killington Road and East Mountain Road has experienced poor traffic flows. During peak hours, this intersection has experienced the lowest rating: LOS F.

155. When Killington Road is realigned and the traffic rotary is installed, the traffic flow at this interchange will be markedly improved, such that even during peak hours of traffic it will experience an LOS A.

156. Several intersections along Killington Road are currently rated at LOS C, D or E; the two lowest rated intersections (Dean Hill Road and Miller Brook Road) receive their lowest ratings during times of heavy traffic, particularly for traffic attempting to turn up (south) Killington Road, against the flow of the heaviest traffic.

157. The anticipated traffic added by the Phase I developments to these intersections during the peak hour of traffic is unlikely to materially degrade the LOS rating for each intersection. Stated differently, it is unlikely that the LOS rating for these intersections will decrease due to the anticipated added traffic generated by the proposed Phase I developments.

158. The Killington Road/U.S. Route 4 intersection has historically experienced an LOS E rating during existing peak traffic conditions. If the use of a traffic control officer at this intersection is maintained for the thirtieth heaviest peak traffic hours, the LOS rating will not get worse because of the proposed developments. In fact, with the continued use of the traffic control officer during the heaviest peak hours, portions of this intersection (i.e., for vehicles turning with the flow of heaviest traffic), an LOS A rating with be maintained.

### c. Municipal Impacts.

159. There was only one dispute presented at trial that concerned the impacts of SPLC's proposed Phase I developments upon the Town's ability to provide municipal or governmental services: that dispute related to the ability of the municipality to provide adequate responses to fire and safety emergencies.

160. The Town provides for responses to fire and safety emergencies by way of contracting with an independent entity: Killington Fire & Rescue. At trial, the former chief of Killington Fire & Rescue suggested that all residential dwelling units within SPLC's Phase I developments, including the single-family homes and duplexes that may be built in the Ramshead Brook Subdivision, should be required to have pressurized sprinkler systems tied into the public water supply systems that supply those homes. His suggestion was that if such sprinkler systems were in place, a home struck by fire would take longer to be fully involved by the fire, thereby affording the responding firefighters a few more precious minutes to attempt to save some of the involved home or the homes and other structures surrounding it.

161.    The former chief further noted that, especially at times of heavy traffic during the busy winter weekends, traffic along Killington Road has sometimes delayed the ability of responding firefighters to arrive at the scene of emergencies.

162.    We received no evidence of a federal, state, or local regulation that required pressurized sprinkler systems to be installed in all new residential units.  Portions of the Phase I developments, including commercial spaces, public places, and multi-story residential structures will be required to install pressurized sprinkler systems, pursuant to applicable state laws and regulations.

163.    SPLC has committed to installing pressurized sprinkler systems in the proposed commercial, retail, and residential spaces where it is required to do so under applicable state laws and regulations.  SPLC objects to a condition in any Act 250 approval that may result from these proceedings that requires that all residential units be outfitted with pressurized sprinkler systems.

164.    SPLC has also committed to installing firefighting water hydrants throughout the Ramshead Brook Subdivision.  The presence of nearby water hydrants will allow for fire responders to more easily fight fires that develop within the subdivision.  Fire responders within the Village Core developments will be aided by the water connections and pressurized sprinklers that will be located in all commercial and multi-story buildings.

165.    The Phase I developments will provide significant increases to the Town and state real estate tax base.  We received no evidence of what plans the Town had considered for this increase in municipal tax revenue.  Such additional municipal revenues could mitigate the burden placed upon the Town by the need to provide municipal services to the proposed developments.

166.    There was no suggestion that these new Phase I developments would create an undue burden upon the Town's ability to provide municipal services.  The Town of Killington Planning Commission, an entity that is entitled to statutory party status in any Act 250 permit application proceedings, provided convincing explanations for why a permit condition requiring pressurized sprinkler systems in all new residential structures was not warranted.

d.      *Aesthetic Impacts.*

167.   The Phase I developments consist mainly of proposed redevelopment of existing resort facilities, such as parking lots and base lodges, and infill development on currently wooded lands that are near or adjacent to existing developments at the Resort or separate developments built and maintained by others.

168.   Most of the physical characteristics of the Phase I developments are described in previous sections of this Decision.  The proposed Phase I developments will replace aged and somewhat worn Resort facilities at the main base areas with a coordinated redevelopment that will bring more complementary structures and walkways to the existing development.  Instead of approaching the main base area via undefined gravel parking lots, a visitor will approach a completed Village Core area that welcomes the visitor with varied architectural styles and building materials, all inspired by historic local and resort styles that will provide a sense of place and encourage visitors to remain in the Village Core area to ski, shop, and relax during vacation visits.

169.   The new base lodges to serve skiers utilizing the Snowdon and Ramshead ski lifts will be more integrated and complementary to each other than the existing base lodges.  Their exteriors, made of wooden clapboards other wooden siding and stone foundations, will appear complementary to the other proposed new structures, as well as the nearby existing developments, such as the Killington Grand Hotel and the Mountain Inn.

170.   The other Village Core structures will be of similar exterior appearance, again using a variety of architectural styles and building materials.  All proposed Village Core buildings will be compatible with the architectural styles of the region and its history.

171.   The building exteriors will be of colors that generally follow a northern New England palette.  The exterior siding will generally be in colors ranging from whites to grays, browns, light blues, and light greens.  No pastel colors are proposed.  Trim, windows, and exterior accent colors will be more varied and include deeper red, blue, brown, and green hues.  Roofs will consist of darker grays, blacks, greens, and browns.  This varied color palette will appear appropriate during all seasons.

172.   The proposed Village Green will present an attractive center and will be easily accessible by the planned walkways and internal streets.  The Main Street area will act as a center for Village shops, restaurants, residential units, and commercial spaces, all of which will provide access to the ski resort lifts and facilities within reasonable walking distances.

173.   Two additional parking areas (Lots A and B) will also be located within the Village Core area, as will other parking areas depicted on the site plans.  All of these lots will be paved, with painted lines to denote the parking spaces.  Additional parking will be provided via underground lots beneath the proposed Village buildings.

174.   Signs will be used primarily for directional purposes and will be complementary to the building color palette and architecture.

175.   The proposed lighting will only seek to provide exterior lighting in specific areas of the site where it is needed for safety and security purposes.

176.   The project site can be broken down into four distinct areas:  Killington Road, interior circulation roads, parking lots and the Village Core.  Within each of these four areas, a lighting design was developed and proposed that is appropriate and responds to the uses associated with each area.

177.   The overall illumination levels are very low.  This was achieved in part by using low lamp wattages and low fixture mounting heights, creating a more intimate look and feel.

178.   The lighting controls will use a combination of photo cells and timers, offering the ability to control when the light fixtures will be illuminated.  All fixtures use sharp cut-off luminaires that comply with the International Dark Sky Association standards.

179.   Along Killington Road, the light fixtures are strategically located at key vehicular conflict areas, primarily the roundabout.  The light fixtures specified for this area are mounted 16 feet from finished grade, using 100-watt pulse start metal halide lamps with a Type III distribution pattern.

180.   Along the interior circulation roads, the light fixtures are strategically located in key pedestrian and vehicular conflict areas.  These areas are at roadway intersections and main pedestrian crossings.  The light fixtures specified for this area are mounted 16 feet from

finished grade, using 100-watt pulse start metal halide lamps with a Type III distribution pattern.

181.    The parking lots are illuminated using pools of light offering minimal illumination levels. The light fixtures specified for these areas are mounted 16 feet from finished grade, using 100-watt pulse start metal halide lamps with a Type III distribution pattern.

182.    The Village Core utilizes a variety of light fixtures including pole-mounted lights, building-mounted lights, recessed steps lights, and bollards.  The intent for the Village Core lighting design was to create a low-light-level pedestrian environment using pools of light at key areas, drawing pedestrians through the space.

183.    As for parking within the Ramshead Brook Subdivision, each lot will have an area available for parking or a garage to accommodate parking.  There therefore is no shared parking area or lot proposed for the subdivision.

184.    Most of the area surrounding the proposed locations for the Phase I developments are mountainous.  Thus, most views of the proposed development will be obscured from nearby sites; while more full views of these developments may be had from non-adjacent locations, the distances from such locations will obscure the development's visibility.  We were not provided with any evidence that the proposed developments will be visible from nearby publicly owned highways.

185.    Even from the privately owned portion of Killington Road, the views of the Ramshead Brook Subdivision will be obscured by the woodlands surrounding the subdivision.  To the extent that the future homes developed in the subdivision will be visible from Killington Road, that view is likely to only show portions of the homes' rooftops.  Many similar subdivisions already exist down Killington Road and are similarly situated, such that only portions of rooftops are visible.

186.    The scale, mass, and form of the structures proposed as part of Phase I are consistent with other similar structures in the area, such as the Killington Grand Hotel, The Cascades Lodge, Mountain Green Condominiums, the Mountain Inn, Pinnacle Condominiums, and the existing base area facilities.

46

187. SPLC provided a credible contextual presentation, via PowerPoint presentation, for the Phase I development and the overall master plan, including summaries of the existing developments surrounding the Killington Resort and other Vermont ski resort developments. See SPLC Exhibit 10. This Exhibit and the supporting testimony, most of which was not materially contested, provided a solid factual foundation for our determination that the Phase I development will provide positive and not adverse aesthetic impacts.

**IV.     Twenty-Five-Lot Subdivision and its Impacts**

188. The SPLC properties in and near the Village Core area have been proposed for development for many years. As noted in our introductory section above, much of this area, including earlier subdivisions and developments, have been the subject of previous master plan proposals and review by the District Commission, District Coordinator, this Court, and the Vermont Supreme Court. However, since the administrative amendment for the ten-lot subdivision has expired and the administrative amendment for the fifteen-lot subdivision was reversed by the Supreme Court, we consider the proposed subdivisions in the first instance as part of the pending application, as did the District Commission.

189. SPLC Exhibit 4, pages 1 and 2, accurately locates the individual lots proposed for subdivision or identification as "stand alone" lots. Much of the to-be-subdivided lands adjoin lands that have already been subdivided and/or developed as part of the existing Killington Resort. For example, Parcels V1, V2, and 8A/8B are the lands upon which much of the Village Core development proposed in Phase I will be located; Lots BA1, BA2, 5B4 and 5BN, taken together, constitute the lands upon which the Ramshead Brook Subdivision is proposed.

190. Some of the to-be-subdivided lots currently stand as individual lots, such as the parcels identified as Bear North, Bear South, East Mountain, Foster's Notch, and Cherry Knoll.

191. In sum, these to-be subdivided lands are all adjacent to or near existing developments; seven of the parcels, identified above, are components within the Phase I developments.

192. The individual parcels are identified in the following Table, with an identification of their name, size, and location within the Master Plan:

47

| Summary of Proposed Lots for Subdivision | | | |
|---|---|---|---|
| Parcel Name | Parcel Number[11] | Project Component | Area (acres±) |
| Killington Village | V1 | Phase I | 23.87 |
| Killington Village | V2 | Phase I | 1.50 |
| Ramshead Brook | BA1[12] | Phase I | 2.71 |
| Ramshead Brook | BA2 | Phase I | 1.41 |
| Snowdon Glades | SG2 | Village Master Plan | 2.45 |
| Snowdon Glades | SG3 | Village Master Plan | 6.97 |
| Yodeler's Run | Y2 | Village Master Plan | 5.18 |
| Vale | -- | Village Master Plan | 13.24 |
| Killington Club | C2 | Village Master Plan | 5.34 |
| Killington Club | C3 | Village Master Plan | 1.24 |
| The Links | 16 | Village Master Plan | 25.76 |
| Foster's Notch | -- | Stand Alone Lot | 37.17 |
| Bear Peak North | -- | Stand Alone Lot | 63.32 |
| Bear Peak South | -- | Stand Alone Lot | 113.45 |
| East Mountain Parcel | -- | Stand Alone Lot | 64.42 |
| Village Core | 8A/8B | Phase I | 16.16 |
| Ramshead Brook | 5B4 | Phase I | 30.11 |
| Ramshead Brook | 5BN | Phase I | 10.46 |
| Snowdon Glades | 1B | Village Master Plan | 50.96 |
| Yodeler's Run | 3 | Village Master Plan | 21.87 |
| Snowshed Woods | 17-20 | Village Master Plan | 66.10 |
| Killington Club | 8D | Village Master Plan | 2.94 |
| Killington Club | 29 | Village Master Plan | 4.40 |
| The Links | 14 | Village Master Plan | 10.40 |
| Cherry Knoll | -- | Stand Alone Lot | 256.29 |

---

[11]  See SPLC Exhibit 4 for location of individual lots.

[12]  Lots BA1, BA2, 5B4, and 5BN, when combined, will constitute the entire area that will be encompassed by the Ramshead Brook Subdivision.  See SPLC Exhibit 4.

193. The proposed boundary lines for all of the proposed lots will not cause a risk of impacts to the various interests, particularized or of the general public, that the Act 250 criteria seek to protect.

194. None of the lands proposed for subdivision have been identified as hosting critical wildlife habitat, classified wetlands, or significant streams.

195. SPLC's proposed subdivision and identification of twenty-five lots within and around the Killington Resort will only consist of the identification of boundary lines for parcels within the general Resort area.

196. Since SPLC's pending application does not seek authority to complete any actual development within these remaining six development zones, comprised of the eighteen proposed lots outside of the Phase I development, our analysis of the subdivision's impacts is more succinct.

197. The proposed subdivisions conform to all municipal zoning dimensional requirements.

198. There will be no disturbance of how stormwater flows over any of the proposed subdivisions. While many of the proposed lots adjoin or are surrounded by existing developments, no approval for development within each lot is proposed or sought at this time.

199. No approval is sought for any activity that will generate solid waste. No activity is proposed on the to-be-subdivided lots that will cause an increase of silt or pollutants that could travel via stormwater to area streams, protected wetlands, or other waters governed by the state.

200. The proposed boundary lines will not disturb any streams, their natural flow, their banks or buffer areas. The proposed boundary lines will not affect the flow of stormwater; the interests of riparian owners; or the health, safety, or welfare of the general public in regards to its interests in state protected waters.

201. The configuration of the boundary lines does not interfere with any identified necessary wildlife habitat or endangered species.

202. No primary agricultural soils will be impacted by the proposed subdivision and resulting lots.

49

203. There were no mineral or earth resources identified on the lots proposed to be subdivided.

204. After SPLC had presented its final witness as to the proposed subdivisions and their conformance with the applicable Act 250 criteria (which testimony was completed on the third day of trial: December 4, 2014), the Durkee Entities, through their attorney, Mr. Hershenson, represented that they agreed that SPLC had made sufficient presentations for the Court to conclude that the lots involved in the proposed Phase I developments (Lots V1, V2, BA1, BA2, 8A/B, 5B4 and 5BN) had satisfied all applicable Act 250 Criteria, subject to the production of actual metes and bounds descriptions for such lots.

205. Subsequent to this representation and prior to the close of evidence, SPLC presented Exhibits 36 and 37. These Exhibits detailed surveyed metes and bounds descriptions for all twenty-five of the proposed lots.

206. SPLC has also received municipal approval for all of the proposed subdivided lots.

V. **Future Master Plan Developments and Their Possible Impacts**

207. The overall master plan evidences a significant potential expansion of the commercial and residential components of the Resort development. While several other ski resorts have gone through the master planning process, including Okemo Mountain Resort in Ludlow, the Mount Snow Resort in West Dover, and the Stratton Mountain Ski Resort in Stratton, most of those master plans proposed development for one or two phases. SPLC's master plan is likely to occur over as many as eight phases; full build-out, if permitted and accomplished, could require thirty or more years to complete.

208. We have already provided factual determinations concerning the two elements of the master plan for which SPLC seeks full land use permits in this appeal: the Phase I developments and the Twenty-Five-Lot Subdivision. Our additional findings here concern SPLC's future plans for the six remaining development zones: Snowdon Glades, The Vale, Yodeler's Run, Snowshed Woods, Killington Club, and The Links in SPLC's master plan.

209. SPLC did not provide traffic impact estimates for future phases of the master plan. Given the master plan entails, in total, 2,300 dwelling units and 200,000 square feet of

commercial space, it is reasonable to assume that the potential traffic impacts of the master plan developments may be substantial.

**VI.      Town and Regional Plans**

210.    The Town of Killington Town Plan that was in effect at the time SPLC filed its completed application was adopted on July 19, 2010 ("the Town Plan"). A copy of the Town Plan was admitted at trial as SPLC Exhibit 28.

211.    The lands involved in the Phase I developments are located within areas identified in the Town Plan as the Ski Village District and the Ski Village II District.

212.    The Rutland County Regional Plan that was in effect at the time SPLC filed its completed application was adopted on April 15, 2008 ("the Regional Plan").

213.    The Regional Plan includes a land use map; that map designates the area in which Phase I is located as a "High Density Development Area." The Phase I area is designated on the map as one of only five "Sub-Regional Centers" within the entire County.

214.    The specific provisions of the Town and Regional Plans that apply to the Master Plan in general and the Phase I developments in particular are identified in our Conclusions of Law Section, below.

**Conclusions of Law**

Our review is limited to the legal issues preserved for our review by the Statement of Questions presented by SPLC (as the principal Appellant) and the Durkee Entities (as Cross-Appellants), subject to any pretrial motions that dispose of the questions presented. V.R.C.P. 5(f) (restricting the legal issues that may be presented at trial to only those issues raised in an appellant's statement of questions, subject "to a motion to clarify or dismiss some or all of the questions"); see also 10 V.S.A. § 8504(h) (directing that, in the case of de novo hearings, the legal issues to be addressed on appeal shall be limited "to those issues which have been appealed").

As noted above, our Pre-Trial Motions Decision resolved several legal issues, including various party status challenges raised by SPLC's Questions 1 through 6 from its Statement of Questions, filed November 20, 2013. Further, we directed that SPLC clarify its Question 13,

which SPLC did by its filing on August 20, 2014. That clarified question expressed more of a concern than a legal issue: SPLC was concerned at the outset of this appeal that confusion and errors were committed by the District Commission, specifically in its decision to join two separate applications by two separate applicants (SPLC and KPSRP) in a single hearing and findings decision. We believe that SPLC's concerns in this regard have largely been resolved by this Court's decision to hear separately the appeals of those two separate applications. We also believe that any further clarification that SPLC suggested by its Question 13 will be provided by the directive at the end of this Decision, concerning how a resulting permit must issue.

SPLC raised a further general question by its Questions 7 and 8, when it questioned the propriety of the District Commission in the first instance, and this Court on appeal, rendering findings, conclusions, and permit conditions in regards to the future phases of its master plan, particularly in regards to Act 250 Criteria 5 and 9(K), when SPLC had not requested findings under those criteria. We address this general legal issue raised by SPLC in its Questions 7 and 8 below in the section on our review of the master plan future phases. Also, since SPLC's objections principally concern evidence and conditions relating to future traffic studies and corridor studies, we address this legal issue in our analysis of the Phase I developments under Criterion 5, below.

SPLC also challenged permit conditions in the District Commission permit approval requiring all Phase I buildings to have sprinkler systems under Criterion 7 (SPLC's Question 9); a permit condition requiring SPLC to obtain permit amendments for all dwellings before construction begins under Criterion 8 (SPLC's Question 10); and a permit condition "retaining jurisdiction" under Criteria 5 and 8 (SPLC's Question 11). Finally, SPLC challenged whether its proposal must comply with three regional plans under Act 250 Criteria 5 and 10, or whether it must only comply with the regional plan covering the Town of Killington, where the project is located (SPLC's Question 12).

The Durkee Entities, by their Question 1 through 4, challenge the sufficiency of the review under all applicable Act 250 Criteria of what we have referred to here as SPLC's proposed Twenty-Five Lot Subdivision. We therefore address those questions and the proposed subdivision's conformance to all applicable criteria is a separate section below.

52

All of the remaining questions posed by the Durkee Entities concern challenges to whether the evidence presented supports positive Findings of Fact and Conclusions of Law for SPLC's Phase I developments under Act 250 Criteria 1(E), 5, 8, 9(K), and 10.[13]

I.       **Party Status Determinations**

Both at trial and in post-trial memoranda, several parties requested that the Court revisit and revise certain of its party status determinations.   While we allowed additional evidence to be presented, especially by the Durkee Entities concerning Criterion 9(K), and have considered the related arguments made in the various parties' post-trial filings, we conclude as part of this Merits Decision that we did not receive evidence sufficient to justify changes to our pre-trial party status determinations.

SPLC requests in its post-trial filings that the Court reconsider its ruling that the party status of Charles Demarest, Okemo Limited Liability Company, and the Town of Bridgewater was non-justiciable because none of these parties entered an appearance in this appeal.  SPLC argues that the Court should specifically deny party status to these non-appearing parties in this appeal.  We are not convinced, for two main reasons.  First, we cannot see the distinction between the Court's ruling and the outcome for which SPLC advocates.  These parties chose not to appear or participate in this appeal, and that choice forecloses those parties' ability to participate in any future aspects of this appeal.   Second, since they have not appeared as parties, they cannot be "dismissed."   For both of these reasons, SPLC's challenge to the party status of these three entities is moot, and we **DENY** SPLC'S request for reconsideration.

The Durkee Entities urged the Court to reconsider its determination that they lacked standing under Criteria 9(K).  In our Pre-Trial Motions Decision, we denied party status to all of

---

[13]  Although Mr. Durkee, as well as some other parties, retained party status under Criteria 1(B), 1(C), and 1(D), we note that neither SPLC's nor the Durkee Entities' Statement of Questions reference legal issues based upon these Criteria.  Since we are only jurisdictionally authorized to address the legal issues that are preserved for our review by an appellant's statement of questions, we conclude that we are not authorized to review legal issues based upon Criteria 1(B), 1(C), and 1(D). We have eliminated reference here to the Durkee Entities' Questions 7, 13, and 14 because those Questions raised legal issues under Act 250 Criterion 9(K) and we have previously determined that the Durkee Entities did not present a sufficient showing to support their claim for party status under Criterion 9(K).  See Procedural History Part I.b, supra.  We uphold that decision here. See Conclusions of Law Part I, infra.

the Durkee business entities under Criteria 5 and 9(K).  We granted party status to Mr. Durkee under Criterion 5, but denied it under 9(K), noting that established precedent requires a "higher showing" for party status under Criterion 9(K).  See Pre-Trial Motions Decision at 17 (citing In re North East Materials Grp., LLC, Amended Permit, No. 35-3-13 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Aug. 21, 2013)); see also Re: Van Sicklen Ltd. P'ship, No. 4C1013R-EB, Mem. of Decision, at 8 (Vt. Envtl. Bd. June 8, 2001).  Because Mr. Durkee did not demonstrate a reasonable possibility that Phase I would "materially jeopardize" his use of the roads, we denied him status under 9(K).  Id.  We therefore concluded that none of the Durkee Entities had made the requisite showing to support their claim for party status under Criterion 9(K).

While the evidence presented at trial caused this Court to be concerned about possible traffic impacts, as detailed below, we received no evidence that satisfied the "higher showing" under Criterion 9(K) contemplated by the precedent established in North East Materials Grp., LLC and Van Sicklen, Ltd.  Having reconsidered our 9(K) party status determination, we conclude that our prior denial was appropriate, based upon the representations presented before, during, and after trial.  We therefore specifically **DENY** the Durkee Entities' outstanding reconsideration motion.[14]

We note, however, something that is not expressly stated in our Pre-Trial Motions Decision: other parties, specifically the Regional Commissions, NRB, and ANR, secured party status under Criterion 9(K) and sought to retain that status in the appeal to this Court.  In Questions 7 and 8 in its Statement of Questions, SPLC challenges the propriety of conditions requiring SPLC to contribute to traffic studies imposed by the District Commission under Criteria 5 Criterion 9(K).  Those parties are entitled to rely on SPLC's Statement of Questions, see In re Garen, 174 Vt. 151, 156 (2002), and to present their arguments about whether this condition should be imposed.  In de novo appeal, "whether this condition should be imposed" depends on: (1) whether the Court has the authority to impose it and (2) whether it ought to be imposed, based on the substance of the application and the requirements of Criteria 5 and 9(K).

---

[14] The Durkee Entities' Questions 7, 13, and 14 raise arguments under Criterion 9(K).  We decline to address these questions, since the Durkee Entities do not have standing to raise them.

Thus, though SPLC's questions do not ask for full review of the master plan under Criteria 5 and 9(K), but rather challenge the propriety of specific permit condition, substantive review is inherent in those questions in a de novo appeal. Therefore, even though we concluded that the Durkee Entities had failed to make a sufficient presentation to secure party status under Criterion 9(K), this Merits Decision addresses legal issues presented under Criterion 9(K) by other parties.

Based upon those pre-trial party status determinations, as well as the party status determinations made by the District Commission as to parties who appeared in this appeal and whose status was not challenged prior to trial, we have prepared the following table to memorialize each party's status after all evidence was received at trial:

| Final Party Status Determinations | | |
|---|---|---|
| Party | Property | Criteria |
| SP Land Company, LLC | Applicant; Statutory Party | All Criteria |
| Vermont Natural Resources Board | Statutory Party | All Criteria |
| Vermont Agency of Natural Resources | Statutory Party | All Criteria |
| Stephen Durkee | 2134 Killington Road and 2023 Killington Road | 1(B), 1(D), 1(E), 5, 8, 10 |
| Mountainside Properties, Inc. | East Mountain Road and U.S. Route 4 (2 properties) | 8, 10 |
| Mountainside Development, Inc. | Mountainside Drive | 8, 10 |
| Fireside Properties, LLC | 1128 Killington Road | 8, 10 |
| Killington Village Properties, Inc. | 923 Killington Road | 10 |
| Pinnacle Condominium Association[15] | 203 Old Mill Road | 1(B), 2–5, 8, 9 (G) and 9(K) |
| Highridge Condominium Owners' Association | Killington Road | 1(B), 1(C), 2–5, 8, and 9(A) |
| Mountain Green Condominium Assoc. | 133 East Mountain Road | 1(A)–(E), 2–5, and 8 |
| Edgemont Homeowners' Association | 768 East Mountain Road | 1(B, 2–5, and 8 |

---

[15] In light of the settlement agreement reached between Pinnacle and SPLC, and this Court's granting of the motion to withdraw Pinnacle's objection to the SPLC master plan and KPSRP's Parking Lot plans, we have not considered the objections Pinnacle presented at the master plan trial. See In re Killington Resort Parking Project Site Plan Approval, No. 155-11-14 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Dec. 11, 2015) (Durkin, J.).

| Sherburne Volunteer Fire Dept., Inc. d/b/a Killington Fire & Rescue | Station located at 1973 Killington Road | 7 |
|---|---|---|
| Rutland County Regional Planning Commission | West-Central Vermont member towns; Statutory Party | All Criteria |
| Two Rivers-Ottauquechee Regional Planning Commission | East-Central Vermont member towns; Statutory Party | Only 5, 9(K) and 10, as requested. |
| Southern Windsor County Regional Planning Commission | East-Central Vermont member towns | Friend of the Court status under 5 and 9(K). |

## II.        Master Plan Review

SPLC has requested full positive findings and an Act 250 land use permit for two specific components of its master plan: the Phase I development and Twenty-Five Lot Subdivision. Because a full review and permit is requested, we review the Phase I developments' conformance with all applicable Act 250 criteria in a separate section below. This section addresses future phases of SPLC's master plan, for which SPLC does not seek a full positive findings and a permit in this appeal.

SPLC sought "full findings" for future phases of its master plan under Criteria 1(D), 1(E), 6, 8(A), 9(A), 9(B), 9(C), 9(D) & (E), 9(H), and 9(L). "Full findings" are findings that are binding in applications for specific development permits for future phase of the master plan. For instance, if SPLC received "full findings" for its master plan under Criterion 6, it would not have to submit evidence under Criterion 6 in future phases. SPLC sought "partial findings" under Criteria 1(Air), 2, 3 and 8. "Partial findings" are essentially "guidance" or a "weather report"[16] under some components of review under a particular Act 250 criterion, even though they are not sufficient enough to constitute all the Findings necessary to receive approval under a specific Act 250 criterion. The District Commission did not issue full (i.e., binding) findings to SPLC for any

---

[16] This, at least, is how SPLC uses these phrases. In Act 250 Rule 21, in the District Commission decision below, and in former Environmental Board decisions, see, e.g., Re: Killington Ltd., No. 1R0835-EB (Master Plan), Mem. of Decision *passim* (Vt. Envtl. Bd. Oct. 22, 1999), "partial findings" refers to positive, final findings issued under fewer than all ten Act 250 Criteria. Thus, if SPLC received "full" (i.e., final) findings under the requested criteria, it would have received "partial findings," because it did not receive full Act 250 approval. The Court will use the phrase "partial findings" as SPLC uses it (i.e., to mean "guidance" or a "weather report" under certain criteria), since this appears to be the convention of the parties.

criteria for future phases of its master plan except for Criterion 9(B). SPLC did not appeal the District Commission's failure to issue final findings under the requested criteria.

Rather, SPLC appealed the District Commission's determination, asserted to be under Act 250 Criteria 5 and 9(K), to place conditions 13 and 14 in SPLC's Phase I land use permit; these conditions require that SPLC conduct traffic studies at various intervals and contribute to a corridor study to be completed by the Regional Commissions, and these studies are to include traffic impacts from future phases of the master plan. SPLC initially asserted that neither of these conditions is appropriate for the Court to consider, given that SPLC does not request partial or full findings for its future master plan phases under either Criteria 5 or 9(K). The Durkee Entities and the Regional Commissions argue the SPLC should be required to study the full impacts of both Phase I and of future master plan phases.

We first address SPLC's Question 7, which questions the propriety of the District Commission, or this Court on appeal, imposing permit conditions premised upon Act 250 Criteria 5 (traffic impacts), and 9(K) (impact upon public investments)[17] when it did not seek positive findings under those criteria in regards to its master plan. Our analysis does not consider the propriety of the District Commission's actions, since this appeal is heard de novo. For the reasons detailed below, we decline to render positive findings, or to announce permit conditions, upon the future master plan portion of SPLC's application, since no permit is sought for the proposed master plan development (i.e., the development within the six remaining development zones).

We agree with the basic premise of SPLC's Question 7: in a master plan proceeding, where no permit is sought for the whole of the master plan development, it is unwise, perhaps even improper, for this Court to render findings where no such findings have been sought by the applicant. Such findings may only properly be made upon prior notice to all parties, including the applicant, that such criteria will be considered. Without such notice, the parties will not be fully aware of their obligation to present evidence on the criteria not listed for

---

[17] While SPLC's Question 7 also asserts that SPLC did not seek findings under Criterion 9(A), this representation appears to be in error. We therefore focus our analysis for this Question on the propriety of imposing the challenged conditions under criteria 5 and 9(K).

discussion. This Court, and the District Commission before it, will not be able to render knowledgeable findings when the parties do not receive notice or an opportunity to be heard.

But this determination is premised upon a narrow reading of SPLC's Question 7, particularly in regards to the more broad scope that the Natural Resources Board has established for master plan review. The former Environmental Board published a guidance document entitled "Master Permit Policy and Procedure for Partial Findings of Fact (2000)" ("Master Plan Policy").[18] The stated objective of the Master Plan Policy "is to provide guidance and greater predictability to the applicant and all parties in the review of complex development projects." Master Plan Policy at 1, available at http://www.nrb.state.vt.us/publications/ policies/masterpmtpolicy.pdf.

SPLC has disclosed some generalities about the future phases of its master plan. While SPLC does not seek full findings or an Act 250 permit for all of those future phases, the development details it has disclosed provide a picture of a significant development that may take twenty to thirty years to complete. The impacts of such a complete development, if permitted and completed, will likely be significant, positive and adverse, to the immediate community, the region and beyond. Some of the most significant impacts will flow from the traffic that these new developments generate, due to the volume of visitors that will be attracted and the common understanding that many Vermont resort visitors arrive from out of state. Many of the prior traffic and corridor studies completed for predecessor owners of the Killington Resort, some of which were introduced at trial, speak to the impacts upon highways from Killington to Vermont's eastern border and beyond. While the impacts from such traffic can be managed and mitigated, when needed, the first step in understanding such impacts from future development is to have an accurate understanding of the characteristics of current traffic and its impacts upon highways throughout this region of Vermont.

---

[18] The Natural Resources Board has enacted a revised Act 250 Rule 21(D), which became effective on December 4, 2015, to address the purposes and procedures for master plan review. This new rule appears to codify the policies behind the Master Plan Policy. It was adopted after SPLC filed its application, however, and is not applicable in this appeal.

With these considerations in mind, we turn to the traffic conditions that SPLC challenges in this appeal. The Regional Commissions have pledged to complete a regional corridor study of resort-generated traffic (including traffic from the Killington and Okemo ski resorts) that includes not just Phase I, but future phases of the master plan as well. As explained below in Part IV (Phase I), we impose a condition on SPLC's Phase I land use permit that SPLC contribute $20,000.00 to the cost of such a corridor study, which was estimated at trial to cost approximately $100,000.00. But we also state here as the "guidance" that the Master Plan Policy encourages that the results of long-range traffic studies that gather baseline data and also study the effects of future phases of the master plan will be important information to include when SPLC or its successors file future Act 250 permit applications for the other phases within the master plan development. It is anticipated that this new corridor study, like the previous corridor and traffic studies involving the Killington Resort, will provide accurate, rather than speculative, background information concerning the traffic impacts of the Killington and other resorts that contribute to area traffic.

Our resolution here also answers SPLC's Question 8. While we conclude that a "permit condition" is not permissible under master plan review, since no permit has been applied for or will be issued in these proceedings for all the future phases of SPLC's master plan, we are imposing an obligation upon SPLC in our Phase I review to contribute $20,000.00 to the Regional Commission's planned corridor study to help provide the needed guidance anticipated as SPLC considers applying for future permits; we expect that the completed corridor study will provide the type of guidance encouraged by the Master Plan Policy.

Traffic impacts from the proposed Phase I developments are discussed in more detail below in our discussion of Phase I's conformance with Act 250 Criterion 5. As discussed in more detail there, due to the anticipated traffic impacts and our continuing concern about those impacts, we will condition SPLC's Phase I permit upon SPLC completing regular traffic studies and contributing to the financing for the regional Commission's planned corridor study.

### III.    Twenty-Five-Lot Subdivision

SPLC seeks Act 250 approval to create twenty-five lots in and around the Resort.  This application is for the subdivision or adjustment of boundary lines only—SPLC does not seek to construct any buildings or perform other development with this application.  All twenty-five lots that SPLC proposes to establish are identified on the table in Finding 192, above, and are the subject of Findings of Fact Part V.  While SPLC has sought administrative amendments for the subdivision in the past, there are no longer any approvals for this subdivision in effect.[19]  The Court must therefore determine whether the subdivisions proposed in the pending application conform to all applicable Act 250 criteria before any permit may issue.  10 V.S.A. § 6086(a).

With this said, the Durkee Entities appear, by their Questions 1 through 4, to be under a misconception that an Act 250 applicant must receive specific positive findings and conclusions under every single Act 250 criterion and sub-criterion, whether applicable or not to the specific project.  Certainly, every project is subject to review under all such statutory requirements.  When counted individually, all criteria and sub-criteria total thirty-seven in number.  The enormity of those legal standards does not negate our statutory obligations.  However, the Durkee Entities' assertion here ignores the unappealed findings and conclusions of the District Commission and the practice established by precedent as to how a district commission may fulfill its statutory obligation, particularly when a determination is made that a particular development or subdivision will have no impact under one or more specific criteria or sub-criteria.

The District Commission below and most all parties to this appeal cite to the precedent established by the former Environmental Board and this Court for guidance on what Act 250 criteria are implicated when a subdivision alone is reviewed for state land use approval.  The District Commission correctly noted that what criteria must be addressed by a subdividing

---

[19] As discussed in the Introduction, SPLC originally sought Act 250 approval for a ten-lot subdivision and a fifteen-lot subdivision as "administrative amendments" to the partial findings issued for ASC's original master plan in 2000 (the #1R0835 master plan findings).  SPLC received an administrative amendment for the ten-lot subdivision in 2004 (#1R0835-1).  It was never appealed, and it became final and binding.  It has since expired, however.  The administrative amendment for the fifteen-lot subdivision (#1R0835-3) was reversed by the Supreme Court in In re SP Land Co. Act 250 Land Use Permit Amendment, 2011 VT 104, 190 Vt. 418.

applicant is a question of "the completeness of the application." <u>Killington Village Master Plan</u>, Application #1R0980, Findings of Fact and Conclusions of Law at 58 (Dist. #1 Envtl. Comm. Oct. 7, 2013). The precedent quoted by the District Commission is equally controlling for our analysis here:

> An Act 250 permit application for a subdivision of land, as contrasted with one for the construction of a project on the land, must nevertheless provide enough information for the District Commission to determine whether resources on the land must be assessed or analyzed under the Act 250 criteria for the project property as a whole, before the boundary lines are approved for the subdivision. That is, the applicant must provide enough information about the property and its resources and characteristics to allow the District Commission to determine, for that particular subdivision, which resources or characteristics could be affected by the division or fragmentation of the land itself.

<u>In re Jurisdictional Opinion #6-007 (Appeals of Willey)</u>, Nos. 55-4-10 & 56-4-10 Vtec, slip op. at 5–6 (Vt. Super. Ct. Envtl. Div. Feb. 23, 2011) (citing <u>Re: New England Land Associates</u>, No. 5W1046-EB-R, Revised Findings of Fact, Conclusions of Law, and Order, at 19–20 (Vt. Envtl. Bd. Jan. 7, 1992)).

An additional precedent is operative here: which of the thirty-seven Act 250 criteria and sub-criteria did the District Commission deem to have been fully addressed by the application materials and not contested, such that they may be determined to be satisfied or deemed not applicable to the pending application. In this regard, the District Commission memorialized in its October 3, 2013, Findings of Fact and Conclusions of Law that:

> Prior to taking evidence with regard to the ten Criteria of 10 V.S.A. § 6086(a), the Commission and all parties agreed that the Applicant, through submission of the application materials and supplemental filings, has met the burden of proof with respect to the following Criteria for Phase I and the [twenty-five lot] Subdivision . . . :
>
> | | |
> |---|---|
> | 1 – Air Pollution & Dust Control | 9(C) – Forest |
> | 1(A) – Headwaters | 9(D) – Earth Resources |
> | 1(F) – Shorelines | 9(E) – Extraction of Earth Resources |
> | 6 – Educational Services | 9(F) – Energy Conservation |
> | 9(A) – Impact of Growth | 9(H) – Costs of Scattered Develop. |
> | 9(B) – Primary Agricultural Soils | 9(J) – Public Utilities |
> | | 9(L) – Rural Growth Areas |

Killington Village Master Plan, Application #1R0980, Findings of Fact and Conclusions of Law at 7 (Dist. #1 Envtl. Comm. Oct. 7, 2013).

No party specifically challenged the District Commission's determinations as to these Criteria in regards to either the Twenty-Five-Lot Subdivision or the Phase I developments. We therefore regard those determinations as final.

Further, in its specific review of SPLC's subdivision proposal, the District Commission determined what remaining Act 250 criteria must be considered at hearing; those criteria identified by the Commission were: criteria 1(B) (regarding sewage disposal and stormwater); 2 and 3 (regarding water supplies and impacts thereon); 1(D) (regarding floodways); 1(E) (regarding streams); 1(G) (regarding wetlands); 8(A) (regarding wildlife and endangered species); 9(B) (regarding primary agricultural soils); 9(D) and (E) ( regarding earth resources); and 10 (regarding conformance with local and regional plans). Id. 59–60.

The Durkee Entities asserted at trial and in their post-trial filings that the necessary review of the twenty-five lot subdivision under all Act 250 criteria had still not yet occurred, and that this Court needed to complete that review. The record from the District Commission's proceedings does not support their assertion on this point. We conclude that the record shows a complete review of the proposed subdivision under all Act 250 criteria, and we find no support for the Durkee Entities' assertion that the review was lacking, be it at the District Commission or in this de novo appeal.

In fact, we do not find in the Durkee Entities' Statement of Questions a specific challenge to the District Commission's determination of what criteria needed review. We therefore conclude that the Commission's determination of what Act 250 criteria were at issue to be final. We only regard the Durkee Entities' Statement of Questions 1 through 4 to challenge the specific affirmative findings as to the proposed subdivision. We therefore embark on our own review of the evidence presented in this de novo appeal and whether the subdivision as proposed conforms to the identified criteria.

a.      *Criterion 1(B) (Impacts from Sewage Disposal and Stormwater)*

Act 250 Criterion 1(B) requires a determination that the proposed project "will meet any applicable health or environmental conservation department regulations regarding the disposal

of wastes, and will not involve the injection of waste materials or any harmful or toxic substances into ground water or wells." 10 V.S.A. § 6086(a)(1)(B).

The proposed subdivision of SPLC's land does not call for and will not create wastes that will flow or be injected into the groundwater or nearby wells. Because no development is proposed on the eighteen lots outside of the Phase I development, the proposed subdivision is in conformance with all applicable health and Department of Environmental Conservation ("DEC") regulations, in that there is no requirement to apply for or receive health or DEC permits when no development is proposed. For these reasons, we conclude that the proposed Twenty-Five-Lot Subdivision conforms to Act 250 Criterion 1(B).

b.      *Criterion 1(D) (Floodways)*

Act 250 Criterion 1(D) requires that a proposed development, including a subdivision, be shown to (i) "not restrict or divert the flow of flood waters, and endanger the health, safety and welfare of the public or of riparian owners during flooding; and (ii) . . . not significantly increase the peak discharge of the river or stream within or downstream from the area of development and endanger the health, safety and welfare of the public or of riparian owners during flooding." 10 V.S.A. § 6086(a)(1)(D).

The pending subdivision proposal does not include development proposals at this time, but rather merely the establishment of boundaries to divide the lots and development zones. This means that any impacts to floodways by any future development on the proposed lots will be subject to a thorough review in a future Act 250 proceeding. None of the proposed boundary lines cause impacts to area streams or to the discharges and floodway flows into those streams. For all these reasons, we conclude that the proposed Twenty-Five-Lot Subdivision conforms to Act 250 Criterion 1(D).

c.      *Criterion 1(E) (Stream Impacts)*

Act 250 Criterion 1(E) requires that a project may only receive approval if it is shown that "the development or subdivision of lands on or adjacent to the banks of a stream will, whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety or welfare of the public or of adjoining landowners." 10 V.S.A. § 6086(a)(1)(E).

63

The subdivision proposal does not include any divisions of property or placement of lot lines that will cause any disturbances to any streams or their banks, nor will the proposed division cause stream disturbances that would endanger the general public or downstream adjoining landowners. For all these reasons, we conclude that the proposed subdivision conforms to Act 250 Criterion 1(E).

d. *Criterion 1(G) (Wetlands)*

Act 250 Criterion 1(G) requires that a proposed development, including a subdivision, must comply with any applicable Water Resources Board regulations regarding any impacts on designated significant wetlands. 10 V.S.A. § 6086(a)(1)(G), *citing to* 10 V.S.A., chapter 37.

Circumstances similar to those that controlled our analysis under criterion 1(E) control our analysis here: the proposed boundary lines will not cause any disturbances to any designated significant wetlands or their protective buffers. We therefore conclude that the proposed Twenty-Five-Lot Subdivision conforms to Act 250 Criterion 1(G).

e. *Criteria 2 and 3 (Adequacy of Water Supplies and Impacts upon Adjacent Supplies)*

Act 250 criteria 2 and 3 impose overlapping requirements: first, that any proposed development be shown to "have sufficient water available for the reasonably foreseeable needs of the subdivision or development." 10 V.S.A. § 6086(a)(2). Second, the proposed subdivision or development must be shown to "not cause an unreasonable burden on an existing water supply, if one is to be utilized." 10 V.S.A. § 6086(a)(3).

The subdivision itself will not require or impact upon existing or planned water supplies. For reference purposes only, we note here that there is an existing public potable water supply system that serves the existing Killington Resort development. SPLC proposes to expand the use capacity of that system by improvements to the Snowden Well Field Project and the addition of a new set of wells: the Valley Well Field Project. Once completed, the improved and expanded public potable water supply system will have capacity in excess of the anticipated needs for the entire master plan development. We therefore conclude that there is sufficient water supply to accommodate the proposed subdivision, particularly since no development of the subdivided lots is proposed at this time. Similarly, the proposed development will not

64

cause an unreasonable burden on an existing water supply system, especially since the proposed subdivision will not utilize that water system until development is proposed and approved for the individual lots. The proposed subdivision therefore conforms to Act 250 criteria 2 and 3.

f.    *Criterion 8(A) (Wildlife and Endangered Species)*

Act 250 Criterion 8(A) will allow a subdivision or development to be approved when it has <u>not</u> been "demonstrated by any party opposing the applicant that [the proposed] subdivision or development will destroy or significantly imperil necessary wildlife habitat or any endangered species . . . ." 10 V.S.A. § 6086(a)(8)(A).

Once SPLC had presented its prima facie case, no party opposing SPLC's proposed subdivision made such a showing. We therefore conclude that the subdivision, and the boundary lines proposed for that subdivision, will not "destroy or significantly imperil necessary wildlife habitat or any endangered species." <u>Id</u>. We therefore conclude that the proposed subdivision conforms to Act 250 Criterion 8(A).

g.    *Criterion 9(B) (Primary Agricultural Soils)*

Act 250 Criterion 9(B) requires that a proposed subdivision or development "not result in any reduction in the agricultural potential of the primary agricultural soils" that may be impacted by the proposed project. 10 V.S.A. § 6086(a)(9)(B).

The trial did not reveal any primary agricultural soils within the property proposed for subdivision. The establishment of the proposed boundary lines will not divide primary agricultural soils and therefore will not adversely impact the agricultural potential of such soils. We therefore conclude that the proposed subdivision conforms to Act 250 Criterion 9(B).

h.    *Criteria 9(D) and (E) (Earth Resources)*

Act 250 criteria 9(D) and (E) require that, when a subdivision or development will occur on "land with a high potential for extraction of mineral or earth resources, will not prevent or significantly interfere with the subsequent extraction or processing of the mineral or earth resources" and that, if extraction is proposed, it "will not have an unduly harmful impact upon

65

the environment or surrounding land uses and development . . . ." 10 V.S.A. §§ 6086(a)(9)(D) and (E)(i).

SPLC's proposed subdivision does not contemplate the extraction of any minerals or earth resources. There was also no evidence presented that the lands proposed to be subdivided had "a high potential for extraction of mineral or earth resources." Id. Since no extraction potential exists and none is planned, our review under these criteria is succinct. The proposed subdivision conforms to Act 250 criteria 9(D) and (E).

i. *Criterion 10 (Conformance with Local and Regional Plans)*

Act 250 Criterion 10 requires that a proposed subdivision or development conform to "any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10).

As addressed in more detail below in regards to our discussion of the Phase I development's conformance with Act 250 Criterion 10, the Town Plan and Regional Plan, both of which were admitted as exhibits at trial, do not contain specific provisions that speak against the proposed development or subdivision. In fact, the proposed Twenty-Five-Lot Subdivision has received approval from the Town. Such an approval provides some foundation for a conclusion that the proposed subdivision conforms to the Town Plan, since the Town land use regulations employ the goals established by the Town Plan. To the extent that the applicable Town Plan provisions contain any ambiguity, we rely upon the Town's subdivision approval to evidence conformance with the Town Plan.

The lands proposed for subdivision are within designated zones that both the Town and Regional Plans recognize for ski resort development. While no development is currently proposed, the stated purpose of this subdivision is to prepare individual lots for development that coincides with the goals for this area. The fact that the Regional Plan also designates the area in which the proposed subdivision is located as a "High Density Development Area" reinforces our conclusion. We therefore conclude that the proposed subdivision conforms to Act 250 Criterion 10.

Because we have concluded that the proposed subdivision conforms to all applicable Act 250 criteria that have been preserved for our review in this appeal, we further conclude

66

that the Twenty-Five-Lot Subdivision portion of SPLC's master plan application should be approved and a permit should issue.[20]

## IV.   Review of Phase I Developments—The Village Core and Ramshead Brook Subdivision

### a.   *Scope of Review*

As noted at the beginning of this section, our jurisdictional authority is limited to the legal issues preserved for our review in this de novo appeal.  We therefore look to the remaining questions posed by SPLC and the Durkee Entities to determine what criteria we are called upon to consider in our review of the Phase I developments, which consist of the Village Core developments, including the relocation of Killington Road and East Mountain Road, and the Ramshead Brook Subdivision.[21]  Those criteria are 1(E), 5, 7, 8, 9(K), and 10.

### b.   *Criterion 1(E): Streams*

Act 250 Criterion 1(E) requires that a project may only receive approval if it is shown that "the development or subdivision of lands on or adjacent to the banks of a stream will, whenever feasible, maintain the natural condition of the stream, and will not endanger the health, safety or welfare of the public or of adjoining landowners."  10 V.S.A. § 6086(a)(1)(E).

Our findings concerning stream impacts can be found above in Findings of Fact Part IV. The proposed Phase I developments will be located near area streams and will cause stormwater to flow into those and other area streams, rivers, and brooks.  However, SPLC has done a very credible job in anticipating the impacts of its proposed developments and has worked closely with ANR experts to tailor its proposed developments and new stormwater treatment systems.  The resulting plans, which have been incorporated into the WQRP and stormwater permits endorsed and approved by ANR, will not only assure that that no adverse

---

[20] This answers the Durkee Entities' Questions 1 through 4.

[21]  Another component of the Phase I developments is the expansions of the public potable water supply systems that have served the existing Killington Resort.  Once expanded, the SWF and VWF Projects will provide water supplies for the entire master plan development.  Since this component of the Phase I developments was not the subject of any Question filed by either SPLC or the Durkee Entities, we do not address those water supply expansion Projects in this Merits Decision.

impacts to area streams will flow from the proposed developments, but that the new treatment systems will actually bring improvements to area streams.

Some area streams and brooks have become impaired, undoubtedly in part because of the existing Resort development and its aged stormwater treatment system. The new proposed treatment system will not only protect against adverse impacts from the proposed developments, but will also reduce the adverse impacts from the pre-existing developments.

The proposed stormwater treatment systems will also include several retention ponds that will both treat stormwater and regulate its flow, particularly during 1-year, 10-year, and 100-year storms. These retention and treatment ponds will reduce the incidences of high stormwater flows into the area streams, such that stream bank scouring is less likely to occur. These new treatment systems will reduce the incidences of stream bank scouring from stormwater flowing off of the completed developments, since the natural conditions of the streams and their banks will be maintained in an even more regular fashion than currently exists. Thus, while Mr. Durkee expressed concerns about the Roaring Brook, which borders one of his properties, being further derogated by the proposed developments, we conclude that the credible evidence does not support his concerns and the stream conditions along his property will be better protected by the treatment system improvements that SPLC proposes.

Finally, we did not find credible evidence to corroborate the Durkee Entities' concerns that the lower elevations of the realigned Killington Road and the buildings closest to the Roaring Brook will cause the Brook to lose water through infiltration from its stream bed and towards the developed areas and roadways that are lower in elevation. SPLC has adequately planned to protect from its development causing water loss from the Brook. An ANR expert, experienced in this specific field, refuted the Durkee Entities' assertion, testifying that she has not observed a "losing stream" in similar circumstances. We are convinced that SPLC's proposals will improve the existing impacts upon area streams and will assure that the new developments will help maintain the natural condition of its neighboring streams.

For all these reasons, we conclude that the proposed Phase I developments conform to Act 250 Criterion 1(E).[22]

c.      *Criterion 5: Traffic*

The parties hotly dispute whether the Village Core and Ramshead Brook Subdivision developments will aggravate area traffic problems and, if so, what mitigating conditions this Court may impose.

Criterion 5 requires applicants to demonstrate that their projects "[w]ill not cause unreasonable congestion or unsafe conditions" on the state's roadways.  10 V.S.A. § 6086(a)(5). Opponents of a development bear the burden of persuasion under Criterion 5, though applicants still bear the burden of producing sufficient evidence to support a finding in their favor.  See In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 5 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd, 2009 VT 98, 187 Vt. 208.  A project may not be denied under Criterion 5, but we may impose conditions designed to mitigate anticipated adverse traffic impacts.  Id.; 10 V.S.A. § 6087(b).

As detailed in our findings concerning Phase I traffic, several of SPLC's plan will bring about improvements to the traffic circulation and congestion at what is currently known as the main base area.  A number of these plans, including the traffic rotary and shuttle bus services, would be labeled traffic mitigation measures, were they not part of SPLC's development plans from the start.

While it is unlikely that day skier traffic will materially increase at the Resort, since no plan is proposed to expand or add to the skiing terrain or facilities, the expansion of dwelling units at and near the Village Core will increase the volume of traffic to a material degree.[23] Even when discounting the total traffic that the new dwelling units are likely to generate, given that it is likely that those using the new dwelling units will likely stay overnight for one or several days and when they do, are sometimes less likely to travel all the way down Killington

---

[22] This answers the Durkee Entities' Question 5.

[23]  We use the term "material' here because the likely net traffic increase, even after discounting for visitors who stay on the mountain for one or several nights, is likely to represent as much as a 10% increase over the existing peak hour traffic.

Road, the new traffic generated down Killington Road, to U.S. Route 4 and beyond, is likely to total no more than 100 vehicle trips during the peak hour of traffic. That peak hour of traffic historically occurs on the busiest Saturday afternoon of the winter skiing season.

The traffic generated by these new developments differs from conventional residential and commercial developments, in that all of the busiest traffic and business hours occur during the limited window of the skiing season. While SPLC and the Resort operators likely hope that business will increase during the off-season because of this proposed development, there was no evidence presented that traffic volumes during the off-season will approach anywhere near the peak or design hours of traffic experienced during the four busiest winter months.

While this anticipated traffic increase will be material, the most credible experts did not agree that this volume of traffic necessitates additional signalized intersections along Killington Road. While the traffic increases will be material, particularly at winter peak and design hours, we do not believe that the traffic increases will be substantial enough to lower the levels of service at any intersections along Killington Road, with the possible exception of the Killington Road/U.S. Route 4 intersection. However, with SPLC's pledge to continue to employ one or more traffic control officers at this intersection during the busiest winter weekends, we conclude that the existing LOS rating at this intersection can be maintained.

The evidence revealed some shortcoming in SPLC's plans, particularly in regards to the intersection between the proposed Road H and the realigned Killington Road. However, the evidence also revealed that there were workable remedies to these shortcomings. First, requiring a reduced speed limit down Killington Road, so that the speed limit remains at 25 MPH from the Village Core to the end of the Killington Road realignment, will lower the necessary minimum sight distances at the Road H intersection. So that a driver attempting to turn left (south) from Road H onto Killington Road may see for an adequate distance, we will also condition our approval upon the wooded bank on the southeastern corner of this intersection being cleared, so as to improve the driver's sight distance to a minimum of 280 feet. We will direct that snow clearing on that corner be maintained for the same purpose.

We generally found SPLC's traffic expert's predictions about traffic congestion and safety to be credible. We recognize, however, that traffic estimates are not an exact science,

70

and traffic impacts from developments are impossible to predict with exactitude. We also recognize that Phase I is a very large project, and any small miscalculation in its traffic estimates could lead to additional congestion on a regional scale. We are therefore inclined to impose conditions, similar to conditions 13 and 14 in the District Commission's decision, requiring further study of Phase I's impacts on local traffic (Condition 13) and on regional corridors (Condition 14).

The Regional Commissions have urged us to require a corridor study examining the cumulative impact from all phases of development under the master plan on regional corridors. Though SPLC does not generally object to conditions that require ongoing studies of traffic,[24] Applicant wants those conditions to be tailored to Phase I, and argues that it would be improper for this Court to attempt to mitigate impacts from phases of development that are not before the Court for permit consideration.

As noted above in our Conclusions of Law section concerning the master plan impacts, we do not intend to attach traffic study conditions relating to future master plan phases to our master plan review, particularly since SPLC does not request a permit or findings that would be applicable to all future phases of the master plan. However, due to the significance and enormity of what SPLC does disclose of its future master plan phases, we are compelled to impose a corridor-traffic-impact-study condition, so as to provide some guidance that will prove helpful to any review of future phase developments.

During and after trial, SPLC offered that, if the Court were to direct that SPLC contribute to a corridor study to be completed by the Regional Commissions, it would be reasonable to require SPLC to contribute $12,500.00 to the cost of that study. Given the magnitude of the traffic impacts suggested by SPLC's Phase I developments, as well as the number of housing units that may be added if all of SPLC's master plan proposals were to be completed,[25] we

---

[24] SPLC does not object to condition 13, provided it does not require study of or further mitigation in response to future phases of development. Appellant/Permittee's Proposed Findings of Fact & Conclusions of Law at 22, filed Feb. 2, 2015.

[25] SPLC presented evidence that its master plan, at maximum density build out, would add 2,300 new residential dwelling units to the Killington Resort.

conclude at a more reasonable contribution by SPLC would be $20,000.00 and will incorporate that contribution amount into this condition.

We therefore impose the following conditions. These revised Conditions 13 and 14 are similar to the conditions suggested by the Regional Conditions, since we found the Commissions' proposed conditions to be a reasonable refinement for conditions that we believe are imperative, if we are to be assured that adverse traffic impacts from the proposed Phase I developments will be avoided. We also impose Condition 14, not as a condition upon the future master plan developments (since no permit for such developments has been sought at this time), but so as to provide guidance to the future developer, the individuals and entities impacted, and the District Commission, when permit applications for future master plan phases are reviewed.

1. Permitees must maintain a 25 MPH speed limit along Killington Road, from above the Village Core area to past the access point to Parking Lot G, thereby slowing traffic at the Road H/Killington Road intersection, and reducing intersection sight distances for that intersection.

2. Permittees must place warning signs on Killington Road, above and below the intersection with the proposed Road H, to announce the lowered speed limit.

3. Permitees must clear trees and brush from the southeastern corner at the intersection of Road H and Killington Road, so as to allow a vehicle driver on Road H at that intersection to have an unobstructed view of traffic coming down Killington Road of at least 280 feet. For the same reason, SPLC must also clear snow from the intersection corner during the winter months to maintain the same minimum sight distance.

4. Permittees must continue the practice of stationing a law enforcement officer at the intersection of Killington Road and U.S. Route 4 between 4:00 and 5:00 PM on Saturdays in December and January to assist in the flow of traffic. SPLC must also arrange to have a law enforcement officer at this intersection during any special Resort activities where heavy traffic is anticipated.

5. Condition 13 imposed in the District Commission below shall be replaced with the following:

13. **Traffic Study to be Completed by SPLC.**

The permittee shall monitor traffic prior to occupancy of any of the Phase I developments and then again within one year after completion of Phase I in order to evaluate the actual trip generation rates and traffic impacts of the Phase I project, and to analyze whether those impacts have caused unreasonable congestion or unsafe traffic conditions or endangered the public investment in

the highway networks that serve the Phase I development. The permittee shall also conduct a further traffic study five (5) years after substantial completion of Phase I.

Each traffic study shall be consistent with the Traffic Impact Study Guidelines (VTrans, 2008 or as most recently amended). The District Commission shall retain jurisdiction under Act 250 Criterion 5 and shall have the right to convene a hearing to review the results of this traffic monitoring and to evaluate the need for additional mitigation measures.

This Condition 13 applies to all future owners of any and all subdivided parcels of land; such future developers shall be jointly and severally responsible for compliance with this Condition.

6. Condition 14 imposed in the District Commission below shall be replaced with the following:

14. **Corridor Study to be Completed by the Regional Commissions, with Financial Assistance from Permittee.**

Prior to the occupancy of Phase I, the Regional Commissions shall collect and document traffic counts on the corridors and intersections on the highway network that serves the Resort. This network includes Killington Road, U.S. Route 4 west to Rutland and east to I-89, Vermont Route 100 south to Vermont Route 103, and Route 103 east to I-91.

The Regional Commissions have agreed to prepare a corridor traffic impact study that evaluates the traffic impacts of the Killington Village Master Plan upon the public highway network that serves the Resort. The extent of that highway network shall include all sections along the corridors that experience 75 or more peak hour trips (i.e., Killington Road, U.S. Route 4, U.S. Route 7, Vt. Route 100 and Vt. Route 103 corridors).

This corridor study shall evaluate the traffic impacts in four distinct scenarios:

(1) Baseline conditions (i.e., pre-construction of Phase I);
(2) Estimated Phase II built conditions;
(3) Cumulative impacts (i.e., Phases 1 and 2 combined); and,
(4) Killington Village Master Plan in any later phases and at full build out.

This corridor traffic study shall be consistent with the *Traffic Impact Study Guidelines* (VTrans, 2008 or as most recently amended). The scope of this corridor traffic impact study shall be coordinated with and approved in advance by the Vermont Agency of Transportation.

This corridor traffic study shall be completed by the Rutland Regional Planning Commission, Southern Windsor County Regional Planning Commission

73

and Two Rivers-Ottauquechee Regional Commission. SPLC, its successor or assigns shall contribute the sum of **$20,000.00** at the time the Regional Commissions begin their corridor study to help defray the costs to the Regional Commissions to complete this corridor traffic study, which was estimated at time of trial to cost a total of $100,000.00.

Condition 14 shall apply to all future owners of any and all subdivided parcels of land; such future developers shall be jointly and severally responsible for compliance with this Condition.

With these conditions, which are intended to assure that the Phase I traffic impacts will not materially differ from the estimates of traffic impacts credibly presented at trial and provide guidance as the prospect of this significant master plan development moves forward, the Phase I development will not cause unreasonable congestion or unsafe conditions on area or regional highways. For these reasons, we conclude that the Phase I developments, with these conditions, conform to Act 250 Criterion 5.[26]

d.     *Criterion 7: Burden on Municipal Services*

Criterion 7 of Act 250 requires that projects "not place an unreasonable burden on the ability of the local governments to provide municipal or governmental services." 10 V.S.A. § 6086(a)(7). This is one of several so-called "fiscal criteria" (i.e., criteria 6, 7, 9(A), 9(H), and 9(K))—criteria that are designed to "protect government finances from burdens imposed by new development." See In re St. Albans Grp. & Wal*Mart Stores, Inc., No. 6F0471-EB, Findings of Fact, Conclusions of Law, and Order (Altered), at 27 (Vt. Envtl. Bd. June 27, 1995). Opponents of a project bear the burden of persuasion under Criterion 7. 10 V.S.A. § 6088(b).

Our findings concerning the likely impacts upon local governments of the proposed Phase I developments appear at in Findings of Fact Part IV.f, above.

In its decision below, the District Commission imposed a condition requiring all residential units built in Phase I to have sprinkler systems. SPLC appealed that condition in Question 9 of its Statement of Questions. Killington Fire & Rescue, which is joined in its concerns under Criterion 7 by the NRB, continues to urge such a condition, arguing that traffic caused by the Phase I development will make it difficult for the Town to quickly respond to fires

---

[26] This answers the Durkee Entities' Questions 6, 8, and 9.

at the new residential development constructed in Phase I. It therefore urges the Court to impose a condition requiring all new residential units to contain pressurized water sprinkler systems. Applicant opposes this condition, arguing that sprinkler systems, though common in commercial development, are uncommon in residential settings, are not required by any federal, state, or local regulation, and are not cost-effective.

We reject the Fire Rescue's proposed sprinkler condition for three reasons. First and most importantly, the Department's fears are rooted in concerns over traffic congestion, and we have already imposed several conditions that will be adequate to mitigate traffic congestion. Therefore, as a factual matter, we find it unlikely that the Fire Department will experience material delays in responding to fire calls in the Town after Phase I is built. We do not have authority to impose a condition if that condition is not necessary to alleviate otherwise adverse impacts. See, e.g., In re Trapper Brown Corp., No. 4C0582-15-EB, Findings of Fact, Conclusions of Law, and Order, at 6 (Vt. Envtl. Bd. Dec. 23 1993). Because we find that the Phase I and Subdivision comply with Criterion 7 without the condition, we do not have the authority to impose it.

Second, even if we were to find that traffic from the Project would burden Killington Fire & Rescue's ability to respond to fires quickly, the proposed condition is not an appropriate solution to that problem.

The potential burden under Criterion 7 that the Fire Department has identified is that traffic may delay the Department's response to fires within the Town. This problem would occur town-wide, and would pose a threat to all properties, new and old alike. There is no reason to believe that targeting new Phase I residences alone would successfully alleviate a town-wide problem.

Finally, we note that there are already adequate regulations governing fire suppression and building requirements in place in the Town of Killington. Those regulations are a more appropriate mechanism for dictating fire safety standards for new construction than a tribunal reviewing a specific development under Act 250. We therefore find that Phase I complies with Criterion 7, and we decline to impose condition requiring sprinkler systems in residential

75

dwelling units (other than where such systems are required by applicable state or federal laws and regulations), thereby answering SPLC's Question 9.

 e. *Criterion 8: Aesthetics*

Act 250 Criterion 8 requires that a proposed development will "not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8).

There was no evidence presented of any historic sites that may be impacted by these developments. We therefore focus our legal analysis of the criterion 8 impacts upon the surrounding area, its beauty and aesthetics, and any impacts upon irreplaceable natural areas

Criterion 8 has often been one of the mostly hotly contested aspects of Act 250 litigation. While the statutory directive is succinct, the specific phrases have warranted intensive and multi-phased legal analysis. See Re: Quechee Lakes Corp., Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 17–19 (Vt. Envtl. Bd. Nov. 4, 1985); In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 13–16 (Vt. Envtl. Ct. Feb. 15, 2008) (Durkin, J.), aff'd 2009 VT 98, 187 Vt. 208; In re Appeal of Times & Seasons, LLC, 2008 VT 7, ¶ 8, 183 Vt. 336. This series of cases has established a clear definition of the phrase "undue adverse impacts" under Criterion 8: we must first determine what aesthetic impacts a proposed development will likely bring and whether those impacts will be "adverse." Re: Quechee Lakes Corp. at 17–19 (Vt. Envtl. Bd. Nov. 4, 1985). Whether a project is "adverse" depends as much on its context as the project itself—the fundamental question is whether the project will "fit" its aesthetic environment. Re: Quechee Lakes Corp. at 17–19 (Vt. Envtl. Bd. Nov. 4, 1985). If we determine that those impacts will be adverse, we must then embark upon a determination of whether the adverse impacts will be "undue." Id. A project is "undue" if: (1) it violates a clear, written community aesthetic standard; (2) it is shocking or offensive to the average person; or (3) applicants fail to take reasonably available steps to mitigate the project's aesthetic impacts. Id. This two part test is often referred to as the Quechee test, after the specific development (Quechee Lakes) that was its origin. Eastview at Middlebury, 2009 VT 98, ¶¶ 20–21.

The mountains surrounding the Killington Resort are significant scenic and natural areas. We regard those mountain views as irreplaceable and therefore deserving of protection under criterion 8. However, we also note that the Killington Resort, particularly after the Phase I developments are completed, evidences an appropriate balance between commercial development and protection of adjoining scenic areas of natural beauty. The proposed Phase I developments are principally infill projects. The Resort affords skiers and other visitors the opportunity to enjoy these natural areas, while also allowing other areas outside the proposed developments to continue in their natural state.

The proposed Phase I developments are principally infill projects, since they are principally located on already developed areas that are part of the larger Resort development. The area has served as a center for resort development that has been completed by SPLC's predecessors, as well as many other independent developers. The proposed Phase I developments bring an updated and coordinated appearance to the planned Village Core area that will replace the somewhat worn and disjointed parking lots and buildings that currently exist in the main base area.

The proposed buildings and roadways at the Village Core will provide a welcoming resort aesthetic that will complement the nearby developments, including the Killington Grand Hotel, the Mountain Inn, and other nearby condominium developments. The Phase I projects will bring a sense of place that has been anticipated for many years, even decades, by current and prior owners, Town officials, and regional planners.

Views of the proposed developments, including the Ramshead Brook Subdivision, will be obscured by existing and planned vegetation, trees, and the nearby mountainous terrain. To the extent that views of these developments are even possible from off-site locations, the views will be obscured by surrounding trees and vegetation; views will also be softened and diminished, due to distance.

New lighting within the proposed developments will be downcast and softened so as to lessen or eliminate its impact at off-site locations.

In sum, we regard many of the aesthetic impacts from the proposed development to be positive and conclude that the proposed Phase I developments, if completed as designed, will

not result in any adverse impacts to the surrounding area, its beauty and aesthetics, and nearby irreplaceable natural areas. Having made these determinations, we conclude that we need not conduct an analysis under the second prong of the Quechee test, since we have already concluded that impacts will not be adverse. However, because our aesthetic assessment is based, in part, on the "Design Guidelines" for Ramshead Brook Subdivision submitted by SPLC as Exhibit 9, we incorporate those guidelines as a condition in SPLC's Phase I permit.

In its decision below, the District Commission imposed a condition requiring SPLC to obtain a permit amendment for each residential structure that will be built in the Ramshead Subdivision. See Re: Killington Village Master Plan, No. 1R0980, Land Use Permit, at 1 (District #1 Envtl. Comm'n Oct. 7, 2013). SPLC specifically challenged this condition in Question 10 of its Statement of Questions. We decline to strike this condition from the District Commission permit, because we conclude that such language merely evidence the requirements of future development, given that the Ramshead Brook Subdivision lands are now encumbered by Act 250 jurisdiction. Thus, any further development on such lands would require an Act 250 permit or permit amendment. 10 V.S.A. § 6081(a); see also Act 250 Rule 34(A)(requiring permit amendments to be sought to a previous Act 250 permit where a "material change" to the subdivision or development is proposed).

In its Question 11, SPLC also challenged a specific permit condition "retaining jurisdiction" under Criterion 8 to address potential parking encroachment. We do not find such a condition necessary, and we decline to impose it. For all these reasons, we conclude that the Phase I developments conform to Act 250 Criterion 8.[27]

### f.   *Criterion 9(K): Burden on Public Investment*

The sole concern expressed by the Regional Commissions under criterion 9(K) was the impact upon the area public highways that will be used by the visitors to the Killington Resort.[28] As we noted above in our Pre-trial Motions Decision, established precedent requires a "higher

---

[27] This answers the Durkee Entities' Questions 10–12.

[28] Mr. Durkee also raised concerns about traffic and about Phase I's potential impact on his access to Coolidge State Park under Criterion 9(K). We do not address those arguments because we conclude that Mr. Durkee does not have standing to raise them. See Conclusions of Law Part I, supra.

threshold" under Criterion 9(K) than under Criterion 5. See <u>Re: Swain Dev. Corp. & Philip Mans</u>, No. 3W0445-2-EB, Findings of Fact, Conclusions of Law, and Order at 34 (Vt. Envtl. Bd. Aug. 10, 1990) (emphasis in original); accord <u>Re: Upper Valley Regional Landfill</u>, #3R0609-EB, Findings of Fact, Conclusions of Law, and Order at 46 (Vt. Envtl. Bd. Nov. 12, 1991). The former Environmental Board succinctly summarized the distinction between Criteria 5 and 9(K) as follows:

> Under Criterion 5, the Board looks to see whether a proposed project will create traffic conditions which are unsafe or traffic congestion which is unreasonable. The Board may not deny a project simply because such conditions are present. In contrast, under Criterion 9(K), the Board examines whether a proposed project will <u>materially jeopardize or interfere</u> with a public facility's function, safety, or efficiency or the public's use or enjoyment of or access to such facilities. Because public facilities include public highways, traffic conditions on those highways may be examined under Criterion 9(K), and if material jeopardy or interference will be created, the proposed project may be denied. Thus, the inquiry into traffic safety under Criterion 9(K) involves a higher threshold of material jeopardy or material interference, which is absent from the language of Criterion 5. This conclusion is consistent with the fact that a proposed project may not be denied under Criterion 5 but may be denied under Criterion 9(K).

<u>Re: Swain Dev. Corp.</u>, No. 3W0445-2-EB at 34 (Vt. Envtl. Bd. Aug. 10, 1990).

We have rendered our legal conclusion that the proposed Phase I developments will conform to Criterion 5, subject to the conditions detailed above concerning the speed limit on the realigned portion of Killington Road, the sight improvement work at the Killington Road/Road H intersection, and the revised traffic and corridor study conditions. Because Phase I, as conditioned, satisfies Criterion 5, the proposed project necessarily satisfies the "higher threshold" for review under Criterion 9(K).

Though unlikely, we remain concerned that the traffic estimates that we rely upon in rendering these findings and legal conclusions may differ from the traffic actually generated by the Phase I developments. This is why we have imposed the conditions requiring traffic and corridor studies stated above. Given that those studies will be completed before applications for future master plan phases are reviewed, we anticipate that those studies may also reveal whether the Phase I and future phase developments will "materially jeopardize or interfere with the function, efficiency, or safety of" impacted public highways. In making this

consideration, we emphasize that no determination is made here of whether such impacts may result from future developments, or whether any party may be entitled to party status because of such possible impacts. Rather, when it comes time for the District Commission to review such possible impacts, we simply conclude that because of the significant developments proposed here, the Commission should have the most accurate traffic impact data presented to assist in its determinations from these significant developments.

g.    *Criterion 10: Conformance with Town and Regional Plans*

Act 250 Criterion 10 requires an applicant to show that the proposed project "[i]s in conformance with any duly adopted local or regional plan . . . ." 10 V.S.A. § 6086(a)(10). The Vermont Supreme Court has summarized the necessary analysis as follows:

> Under criterion 10, a project must conform with any local or regional plan. The burden of proving compliance rests on the applicants. A project only conflicts with a plan when the plan's standards are "stated in language that is clear and unqualified, and creates no ambiguity." In contrast, "[b]road policy statements phrased as nonregulatory abstractions," are not equivalent to enforceable conditions.

In re Chaves Act 250 Permit, 2014 VT 5, ¶ 38, 195 Vt. 467 (internal citations omitted) (quoting In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520). Since all components of the master plan are located within Rutland County, we only focus our analysis upon this Regional Plan, a copy of which was admitted as SPLC Exhibit 29.[29]

We were presented with no regulatory language from either the Town or Regional Plan that specifically restricted or prohibited development such as that proposed here by SPLC. A review of the Town and Regional Plans reveals that, in fact, the applicable provisions actually encourage and plan for the types of development proposed as part of Phase I.

The Town Plan identifies the area in which the Phase I developments are located as the "Ski Village District" and the "Ski Village II District." Town Plan (SPLC Exhibit 28) at 27 and 31.

---

[29] This answers SPLC's Question 12, which asks whether the master plan need only comply with the regional plan that encompasses the town of Killington, in the affirmative.

The Town Plan identifies these Districts, their description, and proposed uses in a manner that nearly mirrors the developments that SPLC proposes in Phase I:

6.    SKI VILLAGE DISTRICT (SV)

a.    DESCRIPTION

Lands at and adjacent to the bases of Killington Resort and Pico Mountain have a concentration of people and facilities which suggest that they would be appropriate locations for new villages.

b.    LAND USE PURPOSE

To provide for the continued development of "new" villages within which skiing and other recreational activities are integrated with residential, commercial and other appropriate uses of a support nature.

c.    SUGGESTED LAND USE TYPES

One and two family residential unless under PUD which can contain concentrated residential, commercial and non-polluting light industry uses located on a larger lot size.

d.    RECOMMENDED LAND USE INTENSITY

Minimum lot size approximately 1 acre not in a PUD.  The primary consideration for site development, especially in PUDs, is a well-planned internal organization of land use elements which encourages clustering of buildings and preserving open space, consideration of pedestrian movement and innovation in design which is compatibly integrated with the Town's over-all pattern for growth.

. . ..

13.    SKI VILLAGE II DISTRICT (SVII)

a.    DESCRIPTION

Lands acquired by Killington, Ltd. from the State of Vermont through the 1997 land exchange.  The SVII consists of 408 acres of 1070 acres acquired from the State.  The SVII District lands are centered around the Killington Base Lodge, Ramshead and Snowshed Base Lodges.

b. LAND USE PURPOSE

To provide for the innovative development of a new pedestrian orientated village area containing a variety of mixed residential, commercial, retail, and recreational uses. New development in this district should tie into and complement existing development within the Killington Basin as well as the rest of the Town of Killington community.

c. SUGGESTED LAND USE TYPES

Lands at and adjacent to the bases of Killington Resort and Pico Peak have a concentration of people and facilities which suggest that they would be appropriate locations for village developments. In 2009, the Town approved the conceptual master plan for a new village, including relocation of the Killington Access Road, at the Killington Resort base. This master plan is consistent with the Town's recognition that a redeveloped, high density, mixed-use village area in this location is in keeping with the planned character of this area.

d. RECOMMENDED LAND USE INTENSITY

The entire 408 acres will be contained and reviewed under the provisions of Planned Unit Development which will allow for intense cluster type development in the core village area and less intense development away from the core village area. The primary consideration is for a well planned development of a village style development that features a mix of residential and non-residential land uses, has a strong focus on pedestrian scale, connectivity and circulation, and creates a focal point at the base of the ski area. Flexibility under Planned Unit Development and Site Plan Review should allow for and encourage innovative development and features, such as energy conserving features or low impact development.

Id, at 27–28, and 31–32.

The necessary infrastructure for Phase I will be constructed and connected to facilitate use of the Village Core buildings, road network, and provide buildable lots in Ramshead Brook Subdivision. Ability to serve letters and municipal sign-off letters were introduced into evidence at trial without objection of contradiction. These municipal acknowledgments, as well as privately-owned utilities that exist and will be improved upon as part of SPLC's Phase I developments, demonstrate the capacity of this area to support the Village Core developments and Ramshead Brook Subdivision. In fact, the Village Core and the Ramshead Brook Subdivision are the first steps in creating the concentrated village specifically promoted by the pattern of growth encouraged by the Town Plan. Relocating Killington Road is explicitly supported by the

82

Town Plan. In addition, Phase I focuses on refreshing the entrance to the base of the mountain, just as recommended in the Plan provisions quoted above. Further support for SPLC's development plans is evidenced by the fact that this design has been conceptually approved as PUDs by the appropriate Town land use review panel.

Respecting the Regional Plan, Phase I is also the first step in achieving the vision of greater density within the Sub-Regional Center designated by the Regional Plan as the locus of this development. Regional Plan (SPLC Exhibit 29) at 31. While the Regional Plan does not discuss the Resort at any length, in scattered references the Plan places high value on the Resort and appears to anticipate substantial additional development associated with the Resort.

The Regional Plan describes the Sub-Regional Center serving Killington and Pico Mountains as "an important recreation oriented sub-regional center." Id. at 90. When discussing transit in the area, the Regional Plan refers to "Killington's planned expansion and development of a Vacation Village," and discusses the Killington area becoming "a four-season, world-class destination." Id. at 178. Finally, the Regional Plan describes the Pico and Killington ski resorts as "two of the Region's key tourist destinations." Id. at 195.

Collectively, these comments, along with the designation of the Resort as a "Sub-Regional Center," paint a clear picture that the Regional Plan was drafted to support substantial increased development in the vicinity of the Resort, which is the main purpose of Phase I.

For all these reasons, the Court concludes that the proposed Phase I developments conform with the Town and Regional Plans. For these reasons, we conclude that the proposed development conforms to Act 250 Criterion 10.[30]

Having concluded that the proposed Phase I developments conform to all applicable Act 250 criteria that have been preserved for our review in this appeal, we further conclude that the proposed Phase I portion of SPLC's master plan application should be approved and a

---

[30] This answers the Durkee Entities' Question 15.

permit should issue. We address the terms of that permit and how it may issue in the Conclusions section, below.

## Conclusion

For the reasons discussed above, we conclude that the various elements of SPLC's proposed Twenty-Five-Lot Subdivision as presented in the pending application will not cause or result in a detriment to the public health, safety or general welfare under the applicable Act 250 criteria preserved for our review in this appeal. We therefore **AFFIRM** the District Commissions' approval of SPLC's land use permit application for the Twenty-Five-Lot Subdivision.

We also conclude that the Phase I developments conform to all Act 250 criteria preserved for our review, provided that its construction and operation conform to the terms and conditions below. We therefore **AFFIRM** the District Commission's approval of SPLC's land use permit application for Phase I of the Killington Village Master Plan, subject to the conditions below.

We specifically **REMAND** these proceedings to the District #1 Environmental Commission for the purpose of completing the ministerial act of issuing a permit that incorporates the provisions of the November 20, 2013 Altered Permit that were not appealed in these proceedings, along with the following conditions:

1. All dwellings in the Ramshead Brook Subdivision zone of the Killington Village Master Plan must honor the spirit of the Design Guidelines for the Ramshead Brook Subdivision that were admitted at trial as SPLC's Exhibit 9.

2. Permitees must maintain a 25 MPH speed limit along Killington Road, from above the Village Core area to past the access point to Parking Lot G, thereby slowing traffic at the Road H/Killington Road intersection, and reducing intersection sight distances for that intersection.

3. Permittees must place warning signs on Killington Road, above and below the intersection with the proposed Road H, to announce the lowered speed limit.

4. Permitees must clear trees and brush from the southeastern corner at the intersection of Road H and Killington Road, so as to allow a vehicle driver on Road H at that intersection to have an unobstructed view of traffic coming down Killington Road of at least 280 feet. For the same reason, SPLC must also clear snow from the intersection corner during the winter months to maintain the same minimum sight distance.

5. Permittees must continue the practice of stationing a law enforcement officer at the intersection of Killington Road and U.S. Route 4 between 4:00 and 5:00 PM on Saturdays in December and January to assist in the flow of traffic. SPLC must also arrange to have a law enforcement officer at this intersection during any special Resort activities where heavy traffic is anticipated.

6. Condition 13 imposed in the District Commission below shall be replaced with the following:

13. **Traffic Study to be Completed by SPLC.**

The permittee shall monitor traffic prior to occupancy of any of the Phase I developments and then again within one year after completion of Phase I in order to evaluate the actual trip generation rates and traffic impacts of the Phase I project, and to analyze whether those impacts have caused unreasonable congestion or unsafe traffic conditions or endangered the public investment in the highway networks that serve the Phase I development. The permittee shall also conduct a further traffic study five (5) years after substantial completion of Phase I.

Each traffic study shall be consistent with the Traffic Impact Study Guidelines (VTrans, 2008 or as most recently amended). The District Commission shall retain jurisdiction under Act 250 Criterion 5 and shall have the right to convene a hearing to review the results of this traffic monitoring and to evaluate the need for additional mitigation measures.

This Condition 13 applies to all future owners of any and all subdivided parcels of land; such future developers shall be jointly and severally responsible for compliance with this Condition.

7. Condition 14 imposed in the District Commission below shall be replaced with the following:

14. **Corridor Study to be Completed by the Regional Commissions, with Financial Assistance from Permittee.**

Prior to the occupancy of Phase I, the Regional Commissions shall collect and document traffic counts on the corridors and intersections on the highway network that serves the Resort. This network includes Killington Road, U.S. Route 4 west to Rutland and east to I-89, Vermont Route 100 south to Vermont Route 103, and Route 103 east to I-91.

The Regional Commissions have agreed to prepare a corridor traffic impact study that evaluates the traffic impacts of the Killington Village Master Plan upon the public highway network that serves the Resort. The extent of that highway network shall include all sections along the corridors that experience 75 or more peak hour trips (i.e., Killington Road, U.S. Route 4, U.S. Route 7, Vt. Route 100 and Vt. Route 103 corridors).

This corridor study shall evaluate the traffic impacts in four distinct scenarios:

(1) Baseline conditions (i.e., pre-construction of Phase I);
(2) Estimated Phase II built conditions;
(3) Cumulative impacts (i.e., Phases 1 and 2 combined); and,
(4) Killington Village Master Plan in any later phases and at full build out.

This corridor traffic study shall be consistent with the *Traffic Impact Study Guidelines* (VTrans, 2008 or as most recently amended). The scope of this corridor traffic impact study shall be coordinated with and approved in advance by the Vermont Agency of Transportation.

This corridor traffic study shall be completed by the Rutland Regional Planning Commission, Southern Windsor County Regional Planning Commission and Two Rivers-Ottauquechee Regional Commission. SPLC, its successor or assigns shall contribute the sum of **$20,000.00** at the time the Regional Commissions begin their corridor study to help defray the costs to the Regional Commissions to complete this corridor traffic study, which was estimated at time of trial to cost a total of $100,000.00.

Condition 14 shall apply to all future owners of any and all subdivided parcels of land; such future developers shall be jointly and severally responsible for compliance with this Condition.

To the extent this Court's Findings of Fact and Conclusions of Law relate to the same factual matters or Act 250 criteria considered in the District Commission Decision issued below, this Court's Findings and Conclusions shall control and shall supersede the District Commission Decision.

All admitted trial exhibits are on file with the Environmental Court and will be transferred to the District Commission upon the expiration of all applicable appeal periods. A Judgment Order accompanies this Merits Decision. This completes the current proceedings pending before this Court in this appeal.

Electronically signed on June 21, 2016 at Newfane, Vermont pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge, Vermont Superior Court,
Environmental Division

86